## ARGUED AND DETERMINED

### IN THE

## SUPREME COURT OF THE STATE OF GEORGIA,

## AT MACON,

## FEBRUARY TERM, 1847.

~~~~~~~~~~~~~~~~

No. 25.—Josiah Hudgins, plaintiff in error *vs.* The State of Georgia, defendant in error.

[1.] A juror is not disqualified who has *formed* an opinion from *mere rumour.*

[2.] The 15th section of the 14th division of the Penal Code, allowing the State ten peremptory challenges, is constitutional and valid.

[3.] When the question is whether a homicide is felonious or justifiable, the *opinion* of a witness, as to the *intention* of the deceased in approaching the prisoner, is not evidence; *aliter,* as to any *information* which the witness may have communicated, whether true or false.

[4.] The 12th section of the 4th division of the Penal Code declares, that homicide is justifiable in self-defence, "against any persons who manifestly intend and endeavour, in a riotous and tumultuous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein." This clause of the act does not apply to a single individual, but contemplates the joint action of two or more persons.

[5.] This Court will rarely, if ever, control the discretion of a Circuit Judge, in granting or refusing a new trial in a criminal case because the finding is contrary to evidence; provided there was sufficient proof to warrant the verdict.

Indictment for Murder. From Monroe Superior Court. Tried before Judge Floyd. September Term, 1846.

For the facts, see the opinion of the Supreme Court.

King & Gordon, Harman, Battle & Hardeman, for the plaintiff in error.

McCune, Solicitor General for the State.

*By the Court*—LUMPKIN, J. delivering the opinion.

This is a writ of error to a judgment of the Superior Court of Monroe County.   The plaintiff, Josiah Hudgins, was indicted for the murder of John Anderson.   On the trial John Ross, one of the *tales* jurors, being sworn upon his *voire dire*, under the Act of 1843, answered, " that he had not heard any part of the evidence given under oath, nor had he seen the crime committed, *but had formed an opinion from rumour.*"   Defendant's counsel moved to reject the juror, which motion was overruled, and the juror peremptorily challenged by the prisoner.   And to this opinion of the Court the defendant excepted.

David Crawford, another of the panel, was then called, and having answered in the negative both of the interrogatories propounded by the Act of 1843, he was, by the permission of the Court, peremptorily challenged by the State.   Whereupon the prisoner's counsel excepted.

The testimony having closed in behalf of the State, the defendant proposed to prove, by Anderson Hudgins, his son, that he (witness) said to his father, as the deceased approached the house where the homicide took place, " yonder comes John Anderson, and *he will kill you.*"   The Court refused to admit the latter portion of the answer, whereupon prisoner, by his counsel excepted.

The Court, in summing up, charged the jury, that to make homicide justifiable in self-defence, under the last clause of the 12th section of the 4th division of the Penal Code, that it required *two* or more persons to make the assault therein contemplated.   To which construction of the statute the prisoner, by his counsel, excepted.

The jury having found the defendant guilty, he moved for a new trial, on account of the alleged errors committed by the Court in the several matters hereinbefore recited, and upon the additional ground *that the verdict was contrary to evidence.*   The application was refused, and thereupon defendant excepted.

The record presents the following questions for the decision of this Court:

[1.] First.   Was there error in the Court below in overruling the motion to exclude John Ross?

Second.   In allowing the State peremptorily to challenge David Crawford.

Third.   In rejecting a portion of the testimony of Anderson Hudgins.

Hudgins *vs.* The State of Georgia.

Fourth. In its charge to the jury upon the last clause of the 12th section of the 4th division of the Penal Code.

Fifth. In refusing the application for a *second* new trial.

First. This court is now called on, for the fourth time, solemnly to review and to declare the law prescribing the mode of selecting juries in criminal cases.

In Reynolds *vs.* The State of Georgia, 1 *Kelly's R.* 222, this Court held, that a juror who stated upon oath, in answer to the questions propounded to him by the statute, that he had formed and expressed an opinion from hearsay, was not an *impartial* juror. And of the rectitude of that opinion there can be no doubt in any legal mind. Such an answer constituted a *principal cause* of challenge under the Code of 1833, and so ruled by every Judge in the State, from the period of its adoption. Having decided that Reynolds must be tried under the Act of 1833, inasmuch as his alleged offence was committed before the passage of the Statute of 1843, we therefore could not do otherwise than pronounce *that* a disqualification, which was expressly declared to be so by the law under which the prisoner was tried.

The question again arose in the case of *Kinchen P. Boon* vs. *The State*, 1 *Kelly's R.* 618. There the juror answered in the negative the questions propounded by the Act of 1843. The prisoner proposed to put him upon *triors* for the purpose of proving by witnesses, that he was not indifferent, for the reason that he had formed and expressed an opinion from hearsay or report as to the guilt or innocence of the prisoner. This the Judge at the Circuit refused. After the most deliberate reflection, this Court come to the conclusion, that the Court below erred in denying this application. That if the prisoner could prove what he proposed, it would constitute *presumptively* at least, a disqualification, but that nevertheless, it was competent for the State to restore the juror to fairness and impartiality, if in the judgment of the *triors*, the opinion so formed and uttered, was not of that fixed and decided character, as would prevent the juror from weighing with candour the evidence produced on the trial, and rendering a verdict accordingly.

We had occasion to reconsider this point in the subsequent case of *Warren J. Boon* vs. *The State of Georgia*, 1 *Kelly's R.* 631, when we reiterated our abiding confidence in the soundness of the principle which we had adopted; and subsequent reflection, so far from producing distrust, has but stereotyped upon our minds the

unerring truthfulness of the convictions upon which we acted; and did the present case fall within the rule then laid down, we should not for a moment hesitate or falter.

It is urged that a juror who answers both of the questions under the act of 1843 in the negative, is competent, unless something can be shown which will put the truth of one or both of those answers in issue. Concede, *ex gratia*, that this is a correct interpretation of the statute, what is the second inquiry put to the juror? " Have you any *bias* or *prejudice* resting on your mind, either for or against the prisoner at the bar ? " Consult the most approved lexicographers and standard writers in our language. *Bias* is defined to be, " any thing which turns a man to a particular course, propension, inclination." *Prejudice* is rendered, " prepossession, judgment formed before hand without examination." And is not that man, whose opinion is both preconceived and expressed, *inclined* already to that side ? And is not some evidence necessary before these impressions can be removed and his mind restored to the *straight line* of indifference ? Is it a *perpendicular*, ready to fall on either side, according as the weight of the proof may lodge ?

The question is too plain for argument: he that runs may read, and the wayfarer need not err respecting this matter. The juror may think himself free from *bias* or *prejudice* because he harbours no grudge or personal ill will toward the accused; yet, if he has formed and expressed an opinion as to his guilt, upon the information of those perhaps who were eye and ear witnesses to the transaction, and in whose veracity the juror reposes the most implicit confidence, a mind thus pre-occupied has a *bias* resting on it, and he that doubts or disputes it, neither knows himself, nor whereof he affirms; and it would become the imperative duty of the *triors* thus to decide, and the presiding Judge so to instruct them. The Legislature never intended that any one should be forced upon the jury with an opinion so formed and expressed beforehand, on facts so well authenticated as would govern men's conduct in all the ordinary transactions of life; if they did, why grant to the prisoner and the State the privilege of putting such juror upon his trial in *the manner pointed out by law*, that is, according to the course of the *Common Law*, and to prove such juror incompetent, notwithstanding he so answered the questions propounded to him, as to render himself competent?

When *triors* are appointed it is the right either of the State or the defendant to show that the juror is incompetent, because he

has formed and expressed an opinion from having seen the crime committed, or having heard some part of the evidence delivered on oath, or that he has prejudice or bias resting on his mind; that is, that his judgment has been made up and rendered beforehand, from the statements of those who were present, or from rumours, reports, or newspaper publications. And well might the Supreme Court of New York ask, in delivering its opinion in the case of the People *vs.* Mather, 4 *Wend. R.* 241, shall a grand-juror, who has patiently listened to all the evidence on which an indictment is found, or one who witnessed the commission of the offence, be rejected when called on to try the accused, and shall another be received without exception, who has formed his opinion on *idle* rumours and unauthenticated reports? Of those who entertain an opinion of the guilt of the accused before his trial, they that believe on the slightest evidence, or no evidence at all, manifest, in my judgment, a state of mind less prepared to receive and allow a fair defence, than those who believe on proof which furnishes *prima facie* evidence of guilt.

We have no controversy, therefore, with the Act of 1843. Give it its true and obvious construction and it entirely harmonizes with the great principles and well-established practice of the common law, whose provisions it expressly adopts. Nor are we aware that a contrary interpretation was ever put upon it, or its predecessor of 1833, by any of the eminent judges who have administered the penal laws of the State, since their passage. When, I would ask, was the application refused by the court to appoint *triors* to pass upon the competency of a juror under the Act of 1843, who had formed and expressed a decided opinion, founded upon what he considered an authentic source as to the guilt or innocence of the prisoner?

Should the General Assembly be dissatisfied with the mode of impaneling a jury, designated by the common law, and to which reference is made both in the Acts of 1833 and 1843, on account of the delay or inconvenience attending it, they have the right to refer the matter to the court perhaps, instead of *triors*. On motion of either party, any person who is called as a juror might be examined on oath to know whether he has formed and expressed any opinion, and the nature of that opinion, or whether he is sensible of any bias or prejudice, allowing either party objecting to the juror, to introduce evidence in support of the objection, and if it shall appear to the court that the juror

does not stand indifferent in the cause, to call in another to be substituted in his stead.

The King *vs.* Edmonds et al. decided in England in 1821, 4 *Barn. & Ald.* 471, was an authority much relied upon in Boon's case, to show what the common law rule was upon this subject. From an examination of that case, it will be seen, that the question as to the *qualification* of a juror was not before the court. The point there was, whether it was admissible to ask jurymen if they had not, previously to the trial, expressed opinions hostile to the defendants and their cause, in order to found a challenge to the polls on that ground; it was held, that it was incompetent to do so, but that such expressions must be proved by extrinsic evidence. And here I might dismiss this case, the decision being authority only on the points made by the pleadings. That none, however, may be misled by the force of a great name, I prefer, at the *risk* of being thought minute or even tedious, to investigate the opinions of Chief Justice Abbott, and to see whether the *obiter dicta* thrown out by him, are sanctioned by the authorities cited by himself. After going over the old cases, he concludes by saying, " these ancient authorities show, that expressions used by a juryman are not a cause of challenge, unless they are referred to something of personal ill will towards the party challenging."

The language of Mr. Serjeant Hawkins upon this subject, *liber* 2, *ch.* 43, *sec.* 28, is, says the Chief Justice, " that if the juryman hath declared his opinion beforehand, that the party is guilty, or will be hanged, or the like, yet, if it shall appear that such juror hath made such declaration from his knowledge of the cause, and not out of any ill will to the party, it is no cause of challenge."

Now it is a little remarkable, that the Chief Justice, by omitting, unintentionally of course, an important member of the paragraph which he undertakes to quote, was not only misled himself, but has misled others. The whole section reads thus: "It hath been allowed a good cause of challenge on the part of the prisoner, that a juror hath a claim to the forfeiture which shall be caused by the party's attainder or conviction; *or that* he hath declared his opinion beforehand that the party is guilty, or will be hanged, or the like. Yet it hath been adjudged, that if it shall appear that the juror made such declaration from his knowledge of the cause, and not out of any ill will to the party, it is no cause of challenge." It is obvious that by splitting the *first* paragraph, and connecting the latter portion of it with the *last* paragraph, the author is made to

sanction opinions which he never uttered; and hence the delusion of those who have followed this precedent for want of a sufficient examination into the matter.

What is the doctrine taught by the learned Serjeant? Let him speak for himself. "It hath been allowed a good cause of challenge on the part of the prisoner, that the juror hath a claim to the forfeiture which shall be caused by the party's attainder or conviction; or (to repeat again) "*it hath been allowed a good cause of challenge on the part of the prisoner, that the juror hath declared his opinion be-beforehand, that the party is guilty, or will be hanged, or the like.*" This is the distinct doctrine inculcated by Hawkins, *and ruled by this Court;* and it is not true, as erroneously stated by Chief Justice Abbott, that Hawkins held, " that the declarations of a juryman would not be good cause of challenge, unless it be made in terms, or under circumstances, denoting an ill-intention toward the party challenging." He taught the very *reverse* of this, unless where the declarations were made from the juror's *knowledge of the cause.* To such declarations, according to the old doctrine, *ill-will* had to be superadded, to constitute them a disqualification. With the latter opinion we have nothing to do at present, except to remark, that it is expressly repealed by the Act of 1843. Under this statute, an opinion formed and expressed from a knowledge of the cause, is a principal cause of challenge, whether there be ill-will or not. With due deference, I must think, that every other ancient reference made by Chief Justice Abbott, is authority for the doctrine maintained by this Court; *his own opinion is clear and unequivocal in support of it.* He says, " it does not appear distinctly in what precise form the question was propounded ; but in order to make the answer *available* to any purpose, if it could have been received, it must have been calculated to show," (what?) " an expression of hostility to the defendants, or some of them, A PRECONCEIVED OPINION OF THEIR PERSONAL GUILT, OR A DETERMINATION TO FIND THEM GUILTY. Any thing short of this would have been altogether irrelevant." In the view then of this distinguished Justiciary, " *preconceived opinion* as to the guilt of the prisoner," that is, "*bias*"—"*prejudice*"—would, if admitted to exist, furnish an *available* objection to the juror. Such was the opinion of *Brook & Bubington,* in the 15th century; and, as to this principle, there has been no variableness nor shadow of change for the last three hundred years.

Hudgins *vs.* The State of Georgia.

We now take leave of the case of *King* vs. *Edmonds et al.* Nor do we expect in future to resort either to argument or authority to demonstrate that it is hazardous in the extreme to permit one to be sworn on the jury, who has formed and expressed a *decided* opinion as to the guilt or innocence of the prisoner at the bar. He may esteem himself indifferent and open to conviction; the law, in its humanity, distrusts and consequently rejects him.

It only remains to inquire, whether the *mere formation* of an opinion from *rumour* is a good cause of challenge to the juror. We are of the opinion that it is not. I will not undertake to say that a case might not occur where, upon putting a juror upon *triors*, they might not be justified · in returning him incompetent, *alone* upon the *formation* of his opinion. On the trial of the indictment for burglary and arson in destroying the Roman Catholic Convent at Charlestown, Massachusetts, which was burned down by a great number of persons, it was held, that if the juror thought such destruction was not a crime, he would entertain a prejudice in the cause; and a juror was, therefore, asked if he had *formed* an opinion as to the general guilt or innocence of all concerned in the act. *Commonwealth* vs. *Buzzell*, 16 *Pick. R.* 153.

So in the Commonwealth *vs.* Knapp, 9 *Pick. R.* 496, one of the celebrated Salem murderers, a juror having said, on his *voir dire*, that he had *formed* an opinion from what he had heard, but did not know how much he might be influenced by it, was allowed to be challenged for cause.

In each of these cases, however, there are peculiar circumstances; and the weight of authority is, that a juror is not disqualified unless he has *expressed*, as well as *formed*, an opinion in the case.

Suppose a juror was to answer both of the questions in the negative propounded by the Act of 1843, nevertheless should add, "although I have kept silent touching this matter, still my mind is unalterably made up as to the guilt of the defendant," would any court hesitate to allow such juror to be challenged for cause? Again, even if the juror should not voluntarily disclose the state of his feelings, and either party were to move the court for the appointment of *triors*, to establish upon the juror, *acts* which would evince his leaning, would the application be denied? · We apprehend not.

[2.] Second. Upon the second point made by the bill of exceptions, as to the right of the State to the ten peremptory challenges allowed by the Penal Code of 1833, we have nothing to add to the

opinions heretofore expressed by this Court in Jones *vs.* The State, 1 *Kelly's R.* 610; and Kinchen P. Boon *vs.* The Same, *Id.* 618. We find that similar privileges are granted in Ohio, Alabama, and most of our sister States, and the right to do so sustained by their respective judiciaries.

Third. Was the Judge below right in ruling out the evi- [3.] dence of Anderson Hudgins? who testified that he said to the prisoner "yonder comes John Anderson, and *he will kill you.*" The witness was permitted to state that he notified the defendant that the deceased was approaching, and it was only his opinion as to the *quo animo* or intention for which he was advancing; that was adjudged to be inadmissible. The doctrine on this subject is this, where the question is whether the party acted prudently, wisely, or in good faith, the *information* on which he acted, whether true or false, is original and material evidence. And that portion of the proof which was received, comes strictly within the rule, but the part excluded was the *opinion* only of the witness.

To justify a homicide, the defendant must depend upon the circumstances by which he was at the time surrounded, and under the influence of which he perpetrated the act. Were they sufficient to excite the fears of a reasonable man? and is it evident that the slayer acted under the influence of these fears, and not in the spirit of revenge? was the danger so urgent and pressing, at the time of the killing, that, in order to save his own life, the killing of Anderson was absolutely necessary? does it appear, also, that the person killed was the assailant?

Now all these pregnant inquiries must be solved by the *facts* which transpired, and not by the opinion of a bystander, whether that opinion was communicated to the accused or not.

Had young Hudgins informed his father that Anderson was advancing in great haste, apparently much enraged, that he was using threats of personal violence, armed with a weapon, and the like, all this would be admissible to satisfy the jury that the homicide was in self-defence. The *opinion* of the witness is a very different thing. It would be dangerous in the extreme to permit the belief of any one, whether sincere or feigned, much more the offspring of the accused, to afford a pretext for taking human life.

Levet's case, *Cro. Cas.* 538, 1 *Hale* 42, 474; 1 *Hawk. ch.* 28, *sec.* 27, furnishes a good illustration upon this point. The defendant, who was indicted for the death of Frances Freeman, being in bed asleep in his house, his maid-servant, who had hired the de-

ceased to help her do her work, as she was going to let her out about midnight, thought she heard thieves breaking open the door, upon which she ran up stairs to her master and informed him thereof; who rising suddenly, and running down with his sword drawn, the deceased hid herself in the buttery lest she should be discovered. *Levet's* wife observing some person there, and not knowing her, but conceiving she had been a thief, cried out "*here be that would undo us;*" thereupon Levet ran into the buttery in the dark, not knowing the deceased but taking her to be the thief, and thrusting with his sword before him, killed her. This was ruled to be misadventure. Mr. Justice Foster thought it might be manslaughter — due circumspection not having been used; but the verdict was justified upon the facts of the case. The killing was in the dark, upon a cry of thieves; a stranger discovered skulking from observation; it not appearing that the person was perceived to be a woman, or that there might not be more than one person; on the contrary, what was said by the wife in the hearing of all parties, to which no explanation was offered by the deceased, was calculated to impress the defendant with the belief that there were more. These are the circumstances which are submitted to a jury to justify a killing.

[4.] Fourth. The complaint under this head is the misdirection of the Judge upon the last clause of the 12th section of the 4th division of the Penal Code. The whole section reads thus: " There being no rational distinction between excusable and justifiable homicide, it shall no longer exist. Justifiable homicide is the killing of a human being by commandment of the law, in execution of public justice; by permission of the law in advancement of public justice; in self-defence, or in defence of habitation, property or person, against one who manifestly intends, or endeavours by violence or surprise, to commit a *felony* on either; or against any *persons*, who manifestly intend and endeavour in a riotous and tumultous manner, to enter the habitation of another, for the purpose of *assaulting* or *offering personal violence* to any person dwelling, or being therein."

The Court charged the jury, and we think properly, that it took two or more to commit the offence contemplated in the last clause of this section. By reference to the previous paragraph, it will be perceived, that to make it justifiable in self-defence where *one* only makes the attack, it must be manifest that he intends to commit a *felony*. Not so, however, where there are *two* or *more*. In that

Hudgins *vs.* The State of Georgia.

event, the killing is justifiable, although the assailants design entering the habitation for the purpose of *assaulting*, or offering any personal violence to one of the inmates. The act makes the difference, and it occurs to us with good reason, between individual violence and the assault of a mob. The record shows that the Judge gave in charge to the jury the 16th section of the Code, namely, "that all other instances which stand upon the same footing of reason and justice as those enumerated, shall be justifiable homicide." The prisoner was entitled to ask no more.

Fifth. It only remains to dispose of the last ground, that is, the [5.] refusal of the Court to grant a *second* new trial, on account of the errors alleged to have been committed on the several points already discussed; and for the additional reason, *that the verdict of the jury was contrary to evidence.*

This Court will rarely, if ever, interpose to control the discretion of the Circuit Court, in applications for a new trial, where there has been a finding on the merits; and especially in criminal cases. Where there was no evidence, we might feel it our duty to interfere, not, however, because the *weight* of testimony *preponderated*, in our opinion, against the verdict. Where, too, as in this case, there have been two concurrent verdicts, there must be gross injustice, to induce this Court to send down the case for another trial.

Is this finding by the jury on the facts, one of those extreme cases where the verdict is so palpably against evidence, as to leave no doubt but that it is erroneous? It is necessary to examine the evidence.

James Hudgins was the first witness introduced on the part of the State. He states that Anderson was at work in the field, between one and two o'clock, sometime in June, 1845, when Hudgins, who had just come home from Forsyth, shot the dog of deceased, which was dragged off by the children of Hudgins in the direction where Anderson was at work. Anderson told the son of the defendant to go to the house and tell his father that he would kill his dog. Anderson soon afterwards started in a run toward Hudgins' house; Anderson dropped his hoe at the end of the cotton-row, and walked through the yard, after crossing the inclosure; he had nothing in his hand. When Hudgins was informed by his little daughter, who assisted in removing the dog, what Anderson said, he replied, that if Anderson would come to the house he would shoot him, Anderson traversed the yard rather

slowly after passing the bars. Hudgins' wife said something as Anderson came up, which witness could not hear; he saw Anderson fall when shot by Hudgins; he was struck with the gun on the face, while in the act of falling. Upon his cross examination the witness stated that the dog killed by Hudgins was the property of Anderson; he was getting old, and was not troublesome. Anderson was a young, athletic man. Witness did not see Anderson Hudgins, the son of the defendant, meet John Anderson and try to stop him from going to the house. He is the brother-in-law of Anderson. Does not recollect to have said to Auglin that if the jury cleared the prisoner, that he was good for him. Did not tell Calvin Battle that Hudgins warned deceased not to advance upon him; did not see Hudgins retreat as Anderson advanced.

Elizabeth Anderson heard two reports of guns, one about fifteen minutes after the other; saw Hudgins about one-half hour after the second report; he said "he did not care a d—n for killing Anderson," for that he had money enough to keep him from being hurt. . The houses of Hudgins and Anderson are in sight; prisoner had the broken gun in his hand when she met him; witness became alarmed and ran, thinking that as Hudgins had shot her husband he might kill her.

Thomas Cowart testified, that the killing was on the 5th of June, 1845, at the house of Hudgins, in Monroe County. News reached him, that Hudgins had killed Anderson; he set off, and met Hudgins about midway their respective residences. They stood talking together some ten minutes in the road. William Petty was present. They all proceeded together to the house of Hudgins. They found Anderson lying dead in the yard, some seven or eight feet from the corner of the smoke-house. Hudgins entered his dwelling and brought out and exhibited to them the gun with which he had shot Anderson : it was broken off at the breach. Witness examined Anderson; there was no weapon about him, except a small knife, and it shut in his pocket. The mortal wound was on the left breast: all the shot entered. He saw other bruises on the deceased; they were on the left cheek, not produced by shot, but occasioned by a blow. He saw marks on the ground, some few inches from the head of Anderson; they resembled the impression which would be made by the butt-end of a gun. The right side of Anderson's face was upward, the wound was on the left cheek. From where Anderson lay witness could see the hoe in the field with which he worked; it was about two hundred yards

Hudgins *vs.* The State of Georgia.

off. It is seventy-five yards from the bottom of the hill which Anderson ascended in approaching the house, and he could have been seen at half the distance. It was twenty-five or thirty yards from the bars of the yard to the spot where Anderson fell. Upon being cross examined, witness said that Anderson in strength was not a very powerful man. He was twenty-two or three years old. Hudgins made no attempt to escape. The door of Hudgins' dwelling is forty feet from the smoke-house, and thirty-three to the corpse. The wound was apparently inflicted with common squirrel shot.

Doctor Henry L. Battle, who was called to examine the body, proved that there were sixty-two gun-shot punctures about the nipple of the left breast of the deceased. A large saucer would have covered the whole circumference of the wound. The shot were, some of them, conglomerated, and others separated; thinks the shot entered the lungs, and has no doubt but that they produced instant death. There was an incised wound on one of Anderson's cheeks, produced, as witness thought, by a dull instrument. No wadding appeared to have entered the wound. Upon his cross examination the doctor said that Anderson was a robust, athletic man. He supposed Hudgins to be between forty-five and fifty years old. Anderson would probably have weighed from one hundred and sixty to one hundred and seventy-five pounds.

Walter A. Rogers testified, that he heard Hudgins threaten to kill Anderson. In May, 1845, Anderson Hudgins, and a negro boy, came early in the morning to William Fowler's to get collard plants; commenced drinking, and continued at it throughout the day; that night Hudgins asked witness to accompany him home; the company all started together; Hudgins stepped up to witness, and, putting his arm around his neck, said, "if he did not kill John Anderson G—d d—n his soul." He soon repeated the same language. After walking about half way home, Hudgins again put his arm around the neck of witness, and said "if he did not kill John Anderson G—d d—n his soul to h—l, for he had insulted his wife and family; he had cursed his wife, and rubbed his fist in her face, and would not speak to her." Fowler and Anderson were walking on ahead during these remarks; when they reached the draw-bars Hudgins requested witness to be seated, alleging that he desired to have a talk with him. He again declared that he would kill Anderson. He said "he meant to load his gun and

24

shoot him G——d d——n him." Hudgins spoke these words angrily. Witness made an excuse to get away from him.

Upon his cross examination he admitted that he had never communicated these threats to Anderson, for the reason that he never saw him afterwards; he went to his house for the purpose of telling him, but he had gone over to Hudgins'. Witness was not drunk himself, nor did he consider Hudgins so; all of them had been drinking at intervals, from morning till night. Does not know how much liquor was used; he recollects of two gallons being bought, one of rum and one of whiskey, after Hudgins arrived. Mrs. Hudgins came to Fowler's after her husband, before the company separated. Hudgins said nothing about shooting the dog.

Anderson Hudgins, being sworn on the part of the prisoner, stated, that on the morning of the homicide, his father and deceased conversed together, as friendly as usual, for half an hour. His father returned from the village about one o'clock; soon after he came into the house some of the family said something about the dog, and his father immediately got down his gun and shot him. Witness was dragging the dog down the bluff, when Anderson twice called to him to go and tell his father, that as he had shot his old dog to come and shoot him, adding that he would "beat him into the earth as long as he could find a piece of him." Witness made no reply, and Anderson repeated the same words to Mary Ann, his little sister. She reached the house before he did, and he supposes delivered the message, as his father inquired of him, upon his arrival, if it was so? he answered no. He looked up the hill, and saw Anderson coming in a run toward the house, which fact he communicated to his father, who came out into the yard with his gun. As Anderson drew near, witness requested him to go back, Anderson replied, "I'll be d——d if I do;" and, jumping over the bars, continued to advance in a run. Hudgins warned him three times to stand back, and the last time retreated himself a few steps; but Anderson still pressing forward, Hudgins shot him. Anderson stood a minute or two, hugged up his arms, and, as he went to make a step toward prisoner, he struck him with his gun, and Anderson fell. Hudgins hung the barrel of the broken gun upon the rack, and laid the but on the sideboard. Prisoner went to Lewis Cowart's, who in a short time returned with him and another individual. Hudgins was standing in the middle of the floor, with nothing in his hand, when notified of Ander-

son's approach. He did not raise the gun to his shoulder, but held it to his side when he fired. He says that Anderson gave the dog to Hudgins, who kept him a while and said he would not have him; Anderson refused to take him back, and Hudgins gave him to Samuel Fowler. The dog remained away a few days and came back, when he was shot; he would bite children when any of them would touch him, or cut him with a switch. Deceased was within three or four steps of prisoner when he was shot. He stated that he had given no other account of this transaction to, or in the hearing of, Lewis Cowart, Henry Singleton, James M. Brantley, or any one else.

Martha Ann Hudgins swore that she heard her sister Mary deliver to her father Anderson's message. She saw Anderson coming toward the house in a run, and she informed her father of his approach. He had both fists clenched, and looked very angry. Hudgins said "stand back," Anderson answered "I'll kill you;" Hudgins repeated his warning, and retreated several steps, but deceased rushed on until he was shot. Deceased hugged up his arms, stood still, and exclaimed "Lordy." He then threw up his arms, like he was going to fight, when Hudgins struck him, and he fell. The gun was broke by the blow; he was not more than the gun's length from prisoner when he was shot. He was walking very fast through the yard, and did not halt until he was shot.

Thomas Battle said that Anderson applied to him for a dog some ten days before the catastrophe occurred, assigning as a reason, that he had none, and was living in the woods and needed one. Anderson remarked during the conversation, that when Hudgins was sober he could get along pretty well with him, but that when drunk he was very troublesome.

Jackson Fogarty stated, that in March, 1845, Anderson desired witness to get up a quarrel with Hudgins that he might whip him, adding that he did not like Josiah any how, and "that before the year was out he would be his end." Witness cautioned Hudgins, who is his mother's brother, to be on his guard, for that Anderson would kill him. No one heard these threats; Anderson was not drunk at the time, but "gentlemanly groggy." Witness has been staying, for the last month, at Hudgins' house. He communicated to Hudgins Anderson's threats, in a whisper, the same day they were made, company being present.

Lewis Cowart and Henry Singleton testified, that Anderson

Hudgins stated to them that no words passed between his father and the deceased at the time of the killing.

James M. Brantley says, that Anderson Hudgins told him that when deceased came up, his father told him to stop, and that he halted, when his father shot him. Further, that Anderson was walking when he came round the smoke-house. He also stated to witness that his father called to Anderson three times, saying he would come there and shoot him. He admits that he has some feeling against defendant; does not recollect to have aided in feeing counsel to prosecute the prisoner. He might at some time have said that he was willing to help a little, or something to that effect. He is under no legal obligation to do so.

The testimony of Anderson Hudgins, taken before the Court of Inquiry, on the 5th of June, 1845, was then read by consent. He then swore that he saw John Anderson running from where he was at work, toward the house, slackening his gait as he drew near; when he turned the corner of the meat-house, Hudgins said to him " stand back," and retreated a step or two; Anderson still pursuing was shot. He heard Anderson make no threat.

This then is the case presented by the proof. Does the safe administration of the public justice require that the verdict should be set aside?

It is admitted that Anderson was killed by Hudgins. The law presumes every homicide to be felonious, until the contrary appears, from circumstances of alleviation, of excuse, or justification; and it is incumbent on the prisoner to make out such circumstances to the satisfaction of the jury, unless they arise out of the evidence produced against him. The moment that Anderson fell, Hudgins was stripped of the mantle of innocence with which every man is presumed to be appareled, and he stood forth a murderer in the eye of the law. Has he succeeded, by testimony, in reducing the offence to a lower grade of crime? had the jury the right to say that he failed to do so? might they not find, that there was *express malice* from the threats made the month before? True, he was drinking at the time, and *drunkenness* is a *fact* which has been allowed to be given in evidence to rebut the idea of malice, *when a crime has been committed.* It is equally true, however, that drunkenness is a true revealer of secrets. *In vino veritas est.* (*Give the devil his due.*) There is truth in wine; it extracts secrets from the locked-up bosom, and puts not only the reserved, but even the habitual liar off his guard. All men, when sober, go more or less

masked. Hence the bitter sarcasm, that language is intended to conceal our thoughts instead of being made the legitimate vehicle to communicate them. The most perfect man living would tremble, to have every thought revealed to open day which passes through his breast. Were the exposition to take place universally, society would be dissolved. Drunkenness tears off this mask, and makes bare the inmost soul. And, to my mind, the repeated threats whispered in the ear of Rogers by Hudgins, that he would take the life of Anderson, the man with whom he was then associated in a drinking carousal, that he would load his gun and shoot him, *as he subsequently did*, indicate the most implacable hatred. He imprecated the Divine vengeance upon his soul, if he did not kill Anderson, for he had insulted his wife and family! And this, I doubt not, was the incurable wound that was rankling in his heart. *Vulnus alit venis et cæco confietur igni.* He nourishes this poison in his veins and is consumed by this hidden fire, a fire which nothing but the life's-blood of his enemy could quench.

But grant that the apparent subsequent reconciliation rebuts the inference of malice from the previous threats, what shall we say as to the right of the jury to *imply malice*, from the circumstances attending this tragedy? Did they not denote an abandoned and malignant heart? After shooting mortally his unarmed and defenceless foe, he struck him a blow sufficiently hard to break the barrel of his gun, when in the act of falling; and from the print on the ground of the but of the gun near the head of Anderson, it is not unlikely that the blow was given, or repeated even, after his unhappy victim fell. What provocation was there to justify this cowardly and demoniac conduct? Does this look like self-defence, or like savage assassination? Were there no other feature in the testimony the jury had the right to *infer malice* from this single fact, connected with the other repeated declarations of Hudgins, that he would have the blood of Anderson.

But the finding of the jury does not rest alone upon these grounds, solid as they are. Suppose they should have discredited the colouring given to the case by the children of the defendant, and should believe that Anderson had no idea whatever of attacking Hudgins; that he dropped his hoe to avoid even the appearance of hostility, and came up to the house either to remonstrate with the prisoner, or to execute his threat that he would retaliate by killing Hudgins's dog; and that in his approach for this purpose, and this purpose only, Hudgins, in the presence of his family

and of some of the witnesses who were spectators, inflamed with spirits, his moral man, if indeed he had any, dethroned, and all the long pent-up passions of his fallen nature rampant and clamourous for revenge, shoots Anderson, as he had just done his old dog; thus taking the life of his adversary when there were ample means at hand to protect his own, without resorting to this extremity. What Judge would assume the responsibility of setting aside their verdict?

This Court has, on more occasions than one, since its organization, evinced its determination, from a solemn sense of duty, to extend to unfortunate individuals, convicted of offences, every protection secured to them by the law. Beyond this we cannot go. The attribute of mercy is vested in another department of the Government; besides, the *peace* and *safety* of society must be preserved. The result of our deliberation is, that the judgment of the Court below must be *affirmed.*