## McCRAY *v.* THE STATE.

1. A juror upon the panel put upon the accused in a murder case, whose niece was the first wife of the father of the deceased, but who was not related in any way to the mother of the deceased, the second wife of his father, was not disqualified, by reason of relationship, to sit as a juror upon the trial of the case.

2. A ground of a motion for a new trial, assigning error upon the admission of certain quoted testimony over the objection of the movant, without stating what the objection was upon which the trial judge ruled, is so incomplete that this court can not pass upon it; although it may appear that a valid objection might have been made to such testimony.

3. The rule of evidence requiring the production of the best evidence obtainable is not violated by permitting the genuineness of a signature to an unattested instrument to be proved by a witness who is familiar with the handwriting of the person by whom it purports to have been made,

without introducing the testimony of such person, though he may be easily accessible at the time such proof of the signature is offered.

4. "The opinion of a witness is not admissible in evidence when all the facts and circumstances are capable of being clearly detailed and described so that the jurors may be able to form correct conclusions therefrom."

5. Testimony as to a statement made by the accused, a few days before the homicide, which tended in some degree to illustrate the state of his feelings toward the deceased at the time of the homicide, and to throw some light upon the question of the motive which actuated him when the killing occurred, was not inadmissible because such statement had not been communicated to the deceased.

6. It is not permissible for a witness who testifies to a conversation between himself and another to state to whom such other person referred when, in such conversation, he used the pronoun "them," the opinion of the witness on this question not being competent evidence.

7. Declarations made by the deceased in reference to his motive in seeking to find the accused, though made while on his way to the scene of the homicide in quest of the accused, were not admissible, over the objection of the accused, for the purpose of showing that the intention of the declarant in seeking the accused was peaceful and lawful.

8. Testimony which a witness has given, without objection on his part, can not be excluded on motion of a party to the case, on the ground that the personal privilege of the witness was violated when such testimony was elicited from him.

9. It was not error, in view of the evidence in this case, to admit in evidence, to be considered solely on the question as to the credibility of a witness testifying in behalf of the accused on trial, an indictment against him and such witness, charging them jointly with the offense of assault with intent to murder, alleged to have been committed upon a named person, who, the evidence in the case on trial showed, accompanied the deceased at the time he was killed, and was assaulted as he was leaving the scene of the homicide.

10. Under the evidence in the case, the law of voluntary manslaughter was involved therein.

11. Relatively to the plea of self-defense alone, in a murder case, an instruction that it was important for the jury to determine "whether the offense, if any, the defendant acted in fear of was a felony or not," was not erroneous. But such instruction, if applied to the defense that the homicide was committed in defense of the habitation of the accused against the deceased and another, who were manifestly intending and endeavoring, in a riotous and tumultuous manner, to enter the same for the purpose of assaulting or offering personal violence to some one dwelling or being therein, would be erroneous. The court should have made it clear to the jury that this instruction was intended to apply only to the defense first above indicated, and did not apply to the last mentioned defense.

12. The instructions which were excepted to upon the ground that they deprived the accused of the benefit of his defense which is last mentioned in the next preceding headnote, and the instructions which were excepted

27

to upon the ground that they placed improper limitations or restrictions upon this defense, were not subject to the assignments of error made upon them; as in none of these instructions was the court dealing with the law applicable to homicide in defense of one's habitation, and the court did, elsewhere in the charge, deal with this defense of the accused, and no complaint is made that the instructions on this subject were erroneous or were not full and explicit.

13. The law of justifiable homicide as found in the Penal Code, §§ 70, 71, is not qualified or limited by the law upon the separate branch of the same subject laid down in section 73; and it is error for the court, upon the trial of one indicted for murder, to so charge the jury as to confuse the defense of justifiable homicide under the fears of a reasonable man, based upon the provisions of the two related sections first mentioned, with the defense of absolute necessity to kill, in order to save one's own life, which is contained in section 73.

(a) Under the evidence contained in the record, the law laid down in section 73 was not involved in this case.

APRIL 27, 1910.

Indictment for murder.  Before Judge Seabrook.  Bryan superior court.  October 30, 1909.

Brunswick McCray was tried under an indictment charging him with the offense of murder, the person alleged to have been killed by him being Zenas S. Warnell.  The jury found him guilty of the offense charged in the indictment; whereupon he made a motion for a new trial, which was overruled, and he excepted.  According to the evidence contained in the record, Zenas S. Warnell, the deceased, and his brother D. B. Warnell, were engaged in operating a turpentine farm.  J. B. Boatright was employed by them as "woodsman," and boarded with Zenas Warnell.  Brunswick McCray, the accused, had been, for several years prior to the homicide, employed as a laborer upon the turpentine farm by the Warnells.  On several occasions he had left their premises, or, in the language of Boatright, who was the main witness for the State, had "run off," and the deceased "had gone after him."  Two or three weeks prior to the homicide he again left the premises of the Warnells, and on this occasion he went to the turpentine farm of J. H. Blitch, fourteen or more miles from that of the Warnells.  A few days prior to the homicide he returned to the Warnell place (where the evidence indicates his wife had still remained) at night, and, upon being seen there the next morning by D. B. Warnell, was by him furnished with some rations from the commissary, and was sent in a wagon, in charge of Barker, an employee of the Warnells, to the woods to work.  He apparently did not want to go to the woods to

work, and said to Barker, "I have done left here, and I am going to leave again; they claim an account against me, but I don't owe them anything; anyhow if I do, I am not going to pay them." He also said: "The man who goes after me, it will be judgment with them." Shortly after the conversation he did leave the Warnell place. Barker testified, "He [McCray] remained on Mr. Warnell's place only that night." One night after he left, Z. S. Warnell went to the bedside of Boatright, "woke him up," and asked him to go with him "for Brunswick." Boatright testified that Warnell then told him that he had a warrant, but "said he 'wanted to go to get Brunswick to come back to work for him.' That was the purpose he had in view in going for Brunswick, was to get him to come back and work for him. That was all the purpose that was disclosed to me." Another witness for the State, who lived on the Blitch place, testified that, after Warnell and Boatright got to that place, Warnell told the witness that he had come to get Brunswick McCray to go back to work for him, and did not say that he had come to arrest McCray or that he had a warrant for him. Z. S. Warnell and Boatright, the former armed with a repeating rifle and the latter with a revolver, rode in a buggy to the Blitch place, and to a two-room house thereon, which was the home of Webster McKinney, a brother-in-law of McCray's wife, and his wife and four children. Brunswick McCray and his wife were in this house at the time, the wife having joined the husband there during the night. It was between "daylight and sun-up" when Warnell and Boatright got there. Warnell hailed several times at the gate in front of the house, without getting any response. He and Boatright then went to the door, where Warnell again hailed several times. Finally Webster McKinney "poked his head out of the door." Warnell asked him if "Brunswick McCray was there," to which McKinney responded, "Yes, he is here." Then, according to Boatright's version of what occurred, Warnell walked in the house, but when Boatright started to enter also, McKinney tried to close the door on him and keep him out, but he "pushed on in there anyhow and got in the house." According to the testimony of McKinney, when he opened the door, Warnell asked him if Brunswick McCray was in the house, and he answered, "Yes, sir," and then "asked him did he want to see Brunswick, but he did not say anything." and McKinney said, "If you want to see him, I will

get him out here to you, because don't come in the house and disturb my wife and children; they are all asleep; I am the only one who is up," but McKinney testified that "they came right on in." "They got in the house by shoving the door open and coming right on in," and when they came in McKinney, as he testified, went out. "McCray and his wife slept in that room that night, the first room." Boatright testified that Warnell entered the house with his rifle in his left hand, the muzzle pointing downward, and he (Boatright) entered with his pistol in his right hand, having pulled it out of his pocket when McKinney tried to close the door on him. Warnell, closely followed by Boatright, walked through the front room to the door leading into the back room, pushed this door open, and stepped into the room, calling, as he did so, "Come out of here Brunswick," and just then a gun was fired by some one in this room and Warnell was killed, his brains being blown out, the evidence clearly indicating that the person who fired the gun was Brunswick Mc-Cray. There was evidence as to a paper purporting to be a warrant for the arrest of Brunswick McCray, with blood on it, having been taken from an inside coat pocket of the deceased, by a person who arrived at the scene of the homicide about one o'clock in the afternoon of the day it occurred, and who then made an examination of the dead body. This paper was introduced in evidence by the State, but is not copied in the record sent up to this court. The evidence indicates that there were evidences of erasures and alterations on this paper. At the time when witnesses for the State were being questioned in reference to the finding of this paper upon the dead body, there appears to have been another paper pinned to it, but the witnesses who testified as to the discovery of "the warrant" testified that they did not know whether the other paper was attached to it then or not, and it does not appear that this attached paper was introduced in evidence. There was other testimony not necessary to be stated here.

Oliver & Oliver and T. A. Morgan, for plaintiff in error.

John C. Hart, attorney-general, N. J. Norman, solicitor-general, and Williams & Giles, contra.

FISH, C. J. (After stating the foregoing facts.)

1. One ground of the motion for a new trial complains because the court refused to set aside for cause a juror who was upon the

panel put upon the accused, after the juror had informed the court that the first wife of the father of the deceased was the juror's niece, but that the juror was not related to the mother of the deceased, who was the second wife of his father. It is clear that it does not appear from the statement of the juror that he was related, either by consanguinity or affinity, to the deceased, nor does it appear that he was related to the prosecutor, who was D. B. Warnell, a brother of the deceased. The objection to his competency was, therefore, not well taken.

2. The second ground of the amended motion complains of the admission of certain testimony, objected to by the accused, without stating, however, what the objection made was. While we can conceive of a valid objection to this testimony, we can not, without knowing what the objection which the court overruled was, decide whether the ruling complained of was right or wrong.

3. One ground assigns error because the court, over the objection of counsel for the accused, permitted a witness to testify that the signature upon a document purporting to be a warrant for the arrest of the accused, which the State contended the deceased had in his pocket and was attempting to execute at the time he was killed, was the signature of the magistrate by whom the document purported to have been issued. The ground of the objection was, "that an effort was being made to lay the foundation for the introduction of the paper, that Mr. Eyler [the magistrate] was on the court grounds, that there was higher and better evidence accessible to prove whether or not the signature was that of Mr. Eyler," and the proof offered was secondary and incompetent. While it may seem rather singular that in a case of this extreme gravity, the State, while insisting that the deceased, at the time that he was killed, had in his possession, and was endeavoring to execute, a warrant for the arrest of the accused, and had been lawfully deputized to make the arrest by the magistrate who issued the warrant, should, in seeking to lay the foundation for the introduction of the paper claimed to be the warrant, have failed to introduce the magistrate by whom it purported to have been issued, when he was so near at hand and when, as the record shows, the judge, during the progress of the trial, informed the counsel in the case that the magistrate was present in the court-room and could be introduced as a witness, yet the objection to the testimony which the State did offer for the purpose

of proving the genuineness of the warrant was not well taken. The rule of evidence requiring the production of the best evidence obtainable is not violated by permitting the genuineness of a signature to be proved by a witness who is familiar with the handwriting of the person by whom it purports to have been made, without introducing the testimony of such person, although he may be easily accessible at the time such proof is offered. *Royce* v. *Gazan,* 76 *Ga.* 79 (4) ; Lefferts *v.* State, 49 N. J. L. 26 (6 Atl. 521) ; McCaskle *v.* Amerine, 12 Ala. 17 ; Smith *v.* Prescott, 17 Me. 277 ; Ainsworth *v.* Greenlee, 1 Hawks (8 N. C.), 190 ; McCully *v.* Malcom, 9 Humph. (Tenn.) 187 ; Foulkes *v.* Com., 2 Rob. (Va.) 836. In *Royce* v. *Gazan,* above cited, objection was made to proving the execution of certain notes and drafts by proving that the signatures of the purported maker of the same were in his handwriting, the objection being that he was present in court and that his evidence would be the best evidence of their execution. It is true that in that case the maker of the notes and drafts was the defendant in the case, and this court held that it would be especially wrong to require a party to call his adversary to prove his own handwriting and thus make that adversary his own witness; but this was merely given as being, in that case, an additional reason for the ruling, that, "If there be no witness to a writing, anybody who knows the handwriting of the maker may prove it." The identical question made in the present case, that is, whether the genuineness of the signature of a magistrate to a criminal warrant may be shown by proof of his handwriting by another person, when the magistrate is himself within call at the time of the trial, was made in McCully *v.* Malcom, supra, and decided in the affirmative. In Ainsworth *v.* Greenlee, supra, a judgment of a justice of the peace in a criminal case was proved by calling witnesses who were acquainted with his handwriting, although the justice was within reach of the processes of the court.

4. A witness who had examined the body of the deceased, about one o'clock in the afternoon of the day he was killed, and who testified that he found the paper purporting to be a warrant for the arrest of Brunswick McCray in an inside pocket of the coat of the dead man, was asked by counsel for the State, whether, from what he saw and the examination that he made, this paper was in Mr. Warnell's pocket at the time he was killed. The witness answered:

"The way the warrant was in there and the way the blood was on it, I don't see how it could be placed in any other time. In my opinion it was there at the time." This testimony was objected to upon the ground that the opinion of the witness upon this question was not competent, and the objection was overruled. The court clearly erred in this ruling. This was not a question for opinion evidence. Whether this paper was in the pocket of the deceased, at the time he was killed, as the State contended, or had been subsequently surreptitiously placed there, as seems, to have been the contention of counsel for the accused, was for determination of the jury alone, who were just as competent as the witness to form an opinion, from the facts to which he testified relative to this matter, whether the paper in question was in the pocket of the deceased at the time he was killed. *Mayor etc. of Milledgeville* v. *Wood,* 114 *Ga.* 370 (2), 372 (40 S. E. 239) ; *O'Neill Mfg. Co.* v. *Harris,* 127 *Ga.* 640 (56 S. E. 739), and cases cited; *Brunswick & Birmingham R. Co.* v. *Hoodenpyle,* 129 *Ga.* 174 (5), 175 (58 S. E. 705) ; *Churchill* v. *Jackson,* 132 *Ga.* 666 (4), 669 (64 S. E. 391).

5. A witness was permitted to testify to a statement made to him by the accused, a few days prior to the homicide, which was to the effect that the Warnells claimed to have an account against him, but he did not owe them anything, and that if any one came after him, to force him to again return to the turpentine farm of the Warnells, where he had been employed as a laborer, "it would be judgment with them." This testimony was objected to upon the ground that the statement of the accused to the witness was irrelevant, unless it had been communicated to the deceased; that if it had no influence or effect upon the deceased, it could not be material. In view of the evidence in the case as to the circumstances under which the homicide occurred, we think this testimony was admissible as tending, in some degree, to illustrate the state of feeling of the accused toward the deceased at the time the homicide occurred, and to throw some light upon the question of the motive of the accused when he fired the shot which took the life of the deceased.

6. The court, over the objections of counsel for the accused, allowed this witness to testify that the accused referred to "Mr. Z. S. Warnell," the deceased, "when he said he was expecting

them." This was clearly a mere opinion, surmise, or conjecture of the witness, and was inadmissible. He could state what the accused said, but had no right, as a witness, to put his own interpretation upon the language of the latter.

7. The court allowed a witness to testify that the deceased, on the morning that the homicide occurred, and while he was in quest of the accused, in a conversation with the witness, "said he did not believe Brunswick would hurt him, nor did he want to hurt Brunswick. All he wanted was to have Brunswick go back and work out his money, what he owed; and if he did that, he would be satisfied." These were merely declarations made by the deceased about his own conduct, not communicated to the accused, and were inadmissible over the objection of the latter.

8. Counsel for the accused moved to rule out certain testimony of one of the witnesses for the accused, on the ground that the witness was not compellable to testify to anything that might tend to disgrace or humiliate him, and that the testimony in question was of that nature. This motion was properly overruled. It may be that this testimony was subject to objection by the accused upon other grounds, but it could not be excluded, merely on his motion, upon the ground urged. Granting that the testimony in question could have been withheld or excluded at the instance of the witness, under his personal privilege, he had not claimed the protection of his privilege, and the accused could not avail himself of it in order to have the testimony excluded from the consideration of the jury. The personal privilege of a witness can not be set up by a party to the cause on trial, as a ground for excluding testimony which the witness gives without claiming the protection of his privilege. *Taylor* v. *State,* 83 *Ga.* 647 (4), 657 (10 S. E. 442).

9. An indictment wherein McCray, the accused in the present case, and the witness McKinney, who testified in his behalf, were jointly charged with the offense of assault with intent to murder, alleged to have been committed upon Boatright, the principal witness for the prosecution, was offered in evidence by the State. Objection was made to its admissibility, which objection was overruled, and on this ruling error is assigned. If it appeared that the indictment was based on a part of the same transaction on which the indictment for murder was founded, that is, if it charged

McCray and the witness McKinney, jointly, with committing an assault with intent to murder on Boatright immediately after the homicide and as he was leaving the scene of the same, the evidence was admissible for the purpose of being considered by the jury in determining the bias of the witness McKinney. It was not admissible merely as being an indictment against McCray or against McKinney. An indictment is a mere charge or accusation by a grand jury, and is no evidence of guilt. Its introduction, therefore, could not be used as tending to show that McCray was guilty of another offense than that for which he was on trial, or as tending to impeach his character, or for the purpose of showing that McKinney was guilty of any offense. The sole purpose for which it was admissible was to show that McKinney had been indicted in connection with McCray for a part of the same transaction about which he testified, so that the jury could consider whether his testimony was given in the light of that fact and of the fact that he was subject to trial under the indictment, and whether his testimony was biased thereby. If the indictment was based on Boatright's testimony that McCray shot at him as he was leaving the scene of the homicide, and that McKinney instigated or urged him thereto, such testimony would tend to show that McKinney was an accomplice. He could not be convicted of the offense charged if the person who was charged with doing the actual shooting could not be convicted. The transactions immediately preceding such shooting might have weight in tending to show whether the person who did the shooting was guilty of the offense charged, or whether, if he was, it should be mitigated, or whether he should be found guilty of any offense or of a lower grade of offense than that charged. If he was found not guilty, McKinney, under the testimony of Boatright, could not be found guilty, and if the person doing the shooting were found guilty of a lower grade of offense than that charged in the indictment, it would enure to the benefit of McKinney. So it was competent to show that McKinney testified in the light of the fact that he was thus jointly indicted with McCray, was subject to trial on that indictment, and that the testimony which he gave in the present trial might benefit or injure him on his own trial.

The court will doubtless carefully instruct the jury so as to limit them in considering the evidence to the purpose for which we have

held it could be legitimately introduced, and inform them that they can not consider it as proving or tending to prove that McCray or McKinney was guilty of the offense therein charged, or that Mc-Cray was guilty of the alleged offense for which he was on trial. But the fact that evidence which is admissible may be considered for an improper purpose, unless the judge shall correctly guard it and instruct the jury in regard to it, is not a ground for its rejection. See *Cochran* v. *State,* 113 *Ga.* 726 (2), 728 (39 S. E. 332); Watts *v.* State, 18 Tex. App. 381. The ruling made in *City Bank of Macon* v. *Kent,* 57 *Ga.* 283-285 (12), is obiter, as the record in that case on file in this court shows that no assignment of error was made upon the admissibility in evidence of the indictments referred to in the ruling. Moreover the decision was rendered by only two Judges, and therefore would not be binding authority even if it were not obiter.

10. Some of the grounds of the motion raise the question whether it was error for the court to instruct the jury in reference to the law upon the subject of voluntary manslaughter; but the accuracy of the specific instructions given upon this subject is not attacked, and hence we express no opinion thereon, but simply determine that under the evidence in the case the law of voluntary manslaughter was involved therein. We deem it proper to say in this connection, however, that neither the paper claimed by the State to be a warrant for the arrest of Brunswick McCray, the accused in the present case, nor the paper said to have been attached to it, which are referred to by some of the witnesses for the State, is before us. The alleged warrant, although introduced in evidence by the State, is not set out in the record, and, so far as the record discloses, the other paper never became a part of the evidence in the case. If, however, the document claimed to be a warrant was really a warrant for the arrest of Brunswick McCray, and the deceased had it in his possession at the time that he was killed, and he was himself the prosecutor, or the other member of the firm of which he was a member had sworn out the warrant for an offense alleged to have been committed against the partnership, it was not lawful for him to attempt to execute it, even if the magistrate who issued it had undertaken to deputize him to do so. One whose name appears upon a warrant as prosecutor, or who, though not named as such in the warrant, is to all intents and purposes a

prosecutor in the case in which the warrant is issued, is not a. proper person to execute the warrant. *Davis* v. *State, 79 Ga. 767* (4 S. E. 318). Furthermore, if a private person relies upon his. having in his possession a warrant and being deputized to execute: it, to justify his conduct in seeking to make an arrest, he must. inform the person sought to be arrested that he is acting by virtue of such warrant. *Davis* v. *State,* supra. In the present case, if the deceased at the time he was killed really had a warrant for the arrest of the accused and was seeking to execute it, he in no way disclosed this fact to the accused, nor did he even so much as inti- mate to the accused, or to any one else at the place where the homi- cide occurred, that he had a warrant or that he intended to arrest the accused. In this connection, it is due to the trial judge to say that in his charge he instructed the jury that, under the evidence submitted, the deceased had no authority to arrest the accused, and that the State did not contend that if an arrest had been made, it: would have been lawful. It is by no means clear from the evi- dence that the deceased was attempting to arrest the accused, but. there is evidence tending to show that he was simply attempting to compel the accused to return and resume work for him. If this. was the fact, if he really was attempting to force the accused to re-- turn to work for the firm of which he, the deceased, was a member,. and not merely attempting to arrest him for an alleged offense, the existence of the warrant, or its possession by the deceased, would afford no justification whatever for his conduct. There is a vast. difference between an honest, though mistaken, effort of one who has a warrant in his possession to execute it, and an effort upon his part to forcibly take the person against whom the warrant has been issued and compel such person. to work for him. It is, perhaps,. proper to state here, that, besides the theory of an attempted ar- rest under a warrant, the State also contended that when the de- ceased, armed with a repeating rifle, and accompanied by a com-- panion and employee, armed with a loaded revolver, started from. the home of the deceased, at two o'clock in the morning, to find the accused, his purpose was to persuade the accused to return and resume work for him, and that this was the sole motive which in- spired and governed his conduct at the scene of the homicide. It will be seen, however, that these two theories were directly con-- flicting.

11.   Exception was taken to the following instruction: "It is important, in determining whether your verdict should be murder, voluntary manslaughter, or not guilty, that you should consider and determine whether the offense, if any, the defendant acted in fear of was a felony or not. If the evidence shows that there was an intention to commit a serious injury, it must also appear that the defendant acted under the influence of those fears, and not in a spirit of revenge." One exception to this instruction is, in effect, that it is erroneous, because it is not necessary for the justification of one who kills another in defense of his habitation, against two or more persons who manifestly intend and endeavor, in a riotous and tumultuous manner, to enter the same for the purpose of assaulting or offering personal violence to some one dwelling or being therein, that he should act under the fears of a reasonable man that they intend to make a felonious assault upon some inmate of the habitation; but that he would be justified if he merely acted under the fears of a reasonable man that the purpose of the invaders was to offer personal violence not amounting to a felony to some one in the house. The instruction complained of would not be erroneous, if applied only to the defense that the accused fired the fatal shot under the fears of a reasonable man that his own life was in jeopardy, or that a serious personal injury, amounting to a felony, was about to be inflicted upon him. Relatively to the question of complete justification for the homicide upon the ground of mere self-defense alone, without regard to the defense of habitation, it was important to determine whether the accused acted under the fears of a reasonable man that a felony was about to be committed upon him by the deceased. But relatively to the defense indicated in the stated exception to this instruction, it was not important to determine whether the accused acted under the fears of a reasonable man that the deceased and his companion were manifestly intending and endeavoring to enter his habitation for the purpose of making a felonious assault upon him or some one else therein; but if he acted under the fears of a reasonable man that their purpose was to make an assault upon, or to offer personal violence, not amounting to a felony, to some inmate of the house, he would be justified. *Hudgins* v. *State,* 2 *Ga.* 173, 182; *Smith* v. *State,* 106 *Ga.* 681 (32 S. E. 851, 71 Am. St. R. 286). The court should have made it clear to the

jury that the instructions complained of applied only to the defense first above indicated, that is, that the homicide was committed in self-defense against a felonious assault upon the person of the accused, or under the fears of a reasonable man that such an assault was being made upon him, and not to the defense that the homicide was committed in defense of habitation against persons manifestly intending and endeavoring, in a riotous and tumultuous manner, to enter the same for the purpose of assaulting or offering personal violence to the accused or some other person dwelling or being therein. As to the last-mentioned defense, the court should have instructed the jury that it was not necessary for the accused, in order to be justified, to have acted under the fears of a reasonable man that the assault or personal violence intended would, if perpetrated, amount to a felony, but that if he acted under the fears of a reasonable man that the purpose intended was to commit an assault upon, or to offer personal violence to, an inmate of the habitation, he would be justified.

12. Several grounds of the motion set forth excerpts from the charge, wherein the court was instructing the jury with reference to the subjects of murder, voluntary manslaughter, justifiable homicide in self-defense, and reasonable fear as a justification for a homicide, or as to some of these subjects, and except to the same, not upon the ground that they were not correct when applied to the particular subject or subjects embraced therein, but upon the ground that they either entirely deprived the accused of his defense that the homicide was committed in defense of his habitation against persons who manifestly endeavored, in a riotous and tumultuous manner, to enter the same for the purpose of assaulting or offering personal violence to some one therein, or had the effect of placing improper limitations or restrictions upon this defense. In our opinion, none of these exceptions is well taken. In none of the instructions so complained of was the court dealing with the law applicable to homicide in defense of one's habitation. The court did, however, elsewhere in the charge, and very properly, we think, under the evidence in the case, undertake to deal with this defense of the accused, and no complaint is made that the court's instructions upon this subject were erroneous or were not full and explicit.

13. The court, after charging upon the subject of reasonable

fear in the language of section 71 of the Penal Code, continued the instruction as follows: "In other words, it must be established that upon the occasion to which this evidence points, . . this defendant had an apprehension or had a fear and had reason to fear, and that the reasons were such as to excite the fears of a reasonable man, not the fears of a coward, but the fears of a reasonably courageous man, that a felony was intended to be committed upon him, or a serious personal injury, and that this shooting was done with a view of defending himself against that danger, either real or apparent; that there was then impending danger; that it was necessary for him to kill to save his own life." The last two clauses of the sentence just quoted are improper qualifications of the doctrine of reasonable fear as applied to the defense of justifiable homicide, and tended to destroy the effect of the instructions upon this subject which immediately preceded them. If it is shown that when the killing occurred the circumstances under which it occurred were sufficient to excite the fears of a reasonable man that his life was in imminent peril, or that an offense was about to be committed against him by the person killed, amounting to a felony, and in striking the mortal blow he really acted under the influence of such fears and not in a spirit of revenge, the homicide is justifiable, whether it was in fact really necessary for him to kill in order to save his own life or not, or whether there was then really impending danger or not. Absolute necessity to kill is not the test by which to determine whether a homicide was justifiable, when the defense of justifiable homicide under the fears of a reasonable man is the question involved. The doctrine of absolute necessity has its proper place in the law of homicide, but that place is not found in the section of the Penal Code which deals with the subject of reasonable fear as a justification for a homicide. Section 73 of the Penal Code, which provides that, "If a person kill another in his defense, it must appear that the danger was so urgent and pressing at the time of the killing, that, in order to save his own life, the killing of the other was absolutely necessary," this court has decided applies exclusively to cases of self-defense arising during the progress of a fight wherein both parties have been at fault. *Teasley* v. *State,* 104 *Ga.* 738 (30 S. E. 938); *Parks* v. *State,* 105 *Ga.* 242 (3), 250 (31 S. E. 580); *Lowman* v. *State,* 109 *Ga.* 501 (34 S. E. 1019); *Delegal* v. *State,* 109 *Ga.* 518

(3), 524 (35 S. E. 105) ; *Pugh* v. *State,* 114 *Ga.* 16 (39 S. E. 875). And it has been repeatedly held that the law as laid down in section 73 does not qualify or limit the law of justifiable homicide as laid down in sections 70 and 71, and that instructions dealing with the law contained in the last two mentioned sections, which are applicable when the homicide is. committed in good faith to prevent the perpetration of any of the offenses mentioned in section 70, or under the fears of a reasonable man that such an offense will be committed, unless the person who is actually, or apparently, about to perpetrate it is killed, should not be confused with instructions as to the law embraced in section 73, wherein absolute necessity to kill is made the test of justifiable homicide.   *Powell* v. *State,* 101 *Ga.* 9, 22-26 (29 S. E. 309, 65 Am. St. R. 277), and cases to this effect cited; *Teasley* v. *State,* supra; *Pugh* v. *State,* supra; *Warrick* v. *State,* 125 *Ga.* 133 (7), 141 (53 S. E. 1027).   In the case with which we are dealing, however, the error of the court was more deep seated than this; for, in no view of the evidence, under the decisions first above cited, could this case fall within the class of cases to which section 73 of the Penal Code is applicable, and hence the question of justification arising from absolute necessity to kill in order to save one's own life was not involved in the case.

*Judgment reversed.   All the Justices concur.*

EVANS, P. J., and ATKINSON, J., concur in the judgment and in the various propositions laid down in the opinion, except that contained in the ninth division.   We think this evidence was inadmissible.   A joint indictment against a witness for the accused and the accused, for a distinct offense, is not admissible to show the bias of the witness.   The defendant's involuntary joinder in the indictment with the witness by the grand jury affords neither presumption nor inference of identity of interest of defense.   By this evidence the credibility of the witness is not attacked by any of his own acts or conduct; but he is sought to be discredited by the ex parte action of the grand jury in returning a joint bill of indictment for a distinct offense against himself and the accused.   If a defendant is to be presumed innocent until proved guilty, a fortiori the standing, character, and credibility of a witness should not be allowed to be impugned by the introduction in evidence of an indictment containing a different charge, which he has never had the privilege of defending.   Our views are in accord with the

ruling in *City Bank of Macon* v. *Kent,* 57 *Ga.* 283 (12); and though the point there decided may have been an obiter dictum. it stands, in our opinion, upon an impregnable basis.