J. A. CALDWELL and others, plaintiffs in error, vs. THE STATE OF GEORGIA, defendant in error.

[1.] Section 4574 of the Code of Georgia, gives to the presiding Judge of the Superior Court discretion to allow or disallow a motion to sever on trial by one of several persons jointly indicted. Where the severance is demanded as a matter of right, without cause shown, and refused, this Court will not disturb the ruling.

[2.] Judgment below refusing new trial on the ground that the verdict was contrary to evidence, affirmed, this court believing that the evidence supports the verdict.

Indictment for Aggravated Riot, in Fulton Superior Court. Motion for new trial decided by Judge BIGHAM. April Term, 1864.

By consent of parties, this case, at the last Term of the Supreme Court, held at Atlanta, to which the writ of error was made returnable, was set down for argument and decision at the present Term at Milledgeville.

Caldwell and twelve others were charged in the same indictment with the offence of aggravated riot, committed, as was alleged, on the 10th day of February, 1864, in the county of Fulton, by breaking Wesley G. Collier's dwelling house, and shooting with guns into the same, and into his beds and bedding and at Collier himself.

The indictment was found at April Term, 1864; and du-

ring the same Term, the case being up in its order, Caldwell and ten of his co-defendants, having pleaded not guilty, announced ready for trial, and moved the Court to be allowed to sever and be tried separately ; which motion was overruled, and they were put upon trial and tried jointly.

At the proper stage of the proceedings, they requested the Court, in writing, to charge the Jury, that if the assembly of the defendants was legal, any subsequent unlawful conduct would not make them guilty of riot. This charge the Court refused to give.

A verdict of guilty having been returned, they moved for a new trial on the ground that these two rulings of the Court were erroneous, and because the verdict was contrary to the charge of the Court, contrary to law, and contrary to the evidence and to the weight of the evidence. A new trial was refused, and they thereupon brought a writ of error to the Supreme Court, where two points only were argued, the others being abandoned. The points insisted upon were, that the defendants had a right to sever and be tried separately, and that the verdict was contrary to the evidence.

The case made by the evidence was substantially as follows :

Maj. George W. Lee, a military officer of the Confederate States, attached to the bureau of conscription, and acting under orders from the Secretary of War, had under him a battalion of six hundred and eighty-three men. His duty was to arrest deserters and stragglers, and to enforce the laws appertaining to conscription. His headquarters were at camp, two miles from Atlanta, and the forces under his command were stationed at various points throughout the State. On the 10th of February, 1864, over one hundred of his men were at Atlanta—among them the defendants in this indictment—all of whom were members of the same company, and were of good moral and military character, quiet, orderly, and well behaved, not given to drinking, frolicking, or any thing of the kind. They were all young men—all except one or two entered on the roll as under eighteen years of age—and

for merit as soldiers, they were, for young men, exceptions in Maj. Lee's camp. Caldwell was a first lieutenant, and stood high as an officer, soldier, and gentleman—was of good moral character, and not in the habit of swearing or getting intoxicated.

Some gentlemen residing in the neighborhood of Buckhead, a locality six or eight miles from Atlanta, called on Maj. Lee for assistance to arrest a band of robbers and thieves, supposed to be deserters, committing depredations in that vicinity. • In response to the call, he issued a written order to Lieutenant Caldwell, instructing him to detail twelve picked men, with two days rations and fifteen rounds of ammunition, and proceed to the neighborhood of Mr. Wash Johnson's, beyond Buckhead, and arrest all such persons at the hazard of their lives and his own. The order charged him to be prompt and prudent, and after crossing Peachtree creek, to inquire at every house where information might be obtained touching the whereabouts of the characters he was in quest of. It directed him, also, to report all his proceedings to Maj. Lee's headquarters.

This order bore date February 10th, 1864, and was delivered to Caldwell at Atlanta, in the afternoon of that day. At the same time Maj. Lee cautioned him verbally, to be very particular not to let any man between 18 and 45 years of age escape, and repeated the injunction respecting promptness and prudence.

In Fulton county, five miles from Atlanta, on the Peachtree road, the road to Buckhead, was the residence of Wesley G. Collier. It was the first house beyond Peachtree creek. At about 8 o'clock on the night of February 10th, 1864, Collier, a man forty years old, with his family, consisting of four children, the eldest fourteen, and the youngest between three and four years of age, was sitting by the fire in one of the front rooms of his dwelling. A servant girl was spinning upon a wheel in the same room. The moon had gone down, and though the stars shone, the night was tolerably dark. The house was unlighted except by the glow of some coals,

the remnant of a fire almost burned out.  The doors were closed and locked, and Collier was about retiring to rest, having for that purpose laid aside his hat and taken off his shoes.  Some persons hailed in front of the house, and said they wanted water.  He ordered a boy to carry some water to them.  Several men had now come into the porch.  Hearing knocks at the door, he demanded, " What do you want?" " To come in," was the answer ; and this was followed by the question, " Is your family at home," to which he answered in the affirmative.  They exclaimed, " raise the windows ;" and going to a window on the side of the house, commenced pulling at it, saying, " open the door."  He told them he would not do it, and to go away and let him alone.  They declared they would come in or break out every d—d door and window in the house.  Calling for an axe, and exclaiming, " knock the windows out," they passed from the side to the end of the house, and knocked all the lower sash and glass out of one window, and nearly all out of another. These windows were on either side of the fire place in the end of the room in which Collier and famly were sitting when the persons first hailed.

Up to this time they had not told Collier, nor did they afterwards tell him, who they were, where they come from, what their business was, whether they were in search of any person or not, or whether they had any warrant or other process.

The children had now been sent off into one of the shed rooms ; and Collier himself, armed with a double barreled shot gun and a small repeater, stood near the partition. which separated the two rooms of the main building.  The gun was loaded with buckshot.

Upon breaking the windows, a voice cried, " come on boys, we have the d—d rascal now," and a man leaped into one of the windows.  Collier levelled his gun and fired.  Some one asked, " Lieutenant, are you hurt?"  The answer was, " yes, I am hurt."  They then said, "fire! G— d d—n him, fire !"  Eight explosions of fire-arms followed, and about

that number of ounce balls and large buckshot were found, on subsequent inspection, to have entered the building. Some came in from the east, others from the south; one or more passed clear through the house; some perforated the beds; one struck just above the children's heads, where they were crouching in the back room; one pierced the partition just behind Collier; one hit the broach on the wheel, knocked off the spindle, hurled it against the side of the room, and drove it into the wall.

Some of the crowd outside having called for fire, and said they would burn down the house, Collier, after instructing his children how to effect their escape, left the house by the back door, and ran towards the woods. In going a distance of some twelve steps, he was shot at four or five times. Streaks of fire darted towards, and passed over him. He saw the guns pointed at him; they were but ten or twelve paces off. Gaining the woods, he ran into them; then turned and came back in rear of the garden, where he stopped and stood until he heard the crowd leave his premises. They took his buggy away with them.

When they were gone, he sent a message to his brother, requesting him to go to town and gather up a force to meet and arrest them. His brother went to Atlanta and communicated with Mr. Jones, the city Marshal. Jones, with two Policemen, some time after ten or eleven o'clock the same night, moved out on the Peachtree road. About two and a half miles from the city they encountered a sentinel posted not far from a large fire in a lane. The sentinel challanged; explanations followed, and Jones passed on to the fire. Before the fire lay a wounded man, shot in the bowels, and apparently in great pain. With him was a party of proba-bly ten or fifteen men, having guns and the accoutrements of soldiers. One of these was Lieutenant Caldwell. A buggy, also, was there.

A conversation ensued, in which the party gave the follow-ing account of themselves and their proceedings: They said they belonged to Col. Lee's Battalion; that Lieutenant Cald-

well was in command, and that they were out under Colonel Lee's orders, for the purpose of hunting up deserters and robbers in the country ; that at a house on the other side of Peachtree Creek they called for water, not knowing who lived there, and asked the man to come out, and he would not ; that they suspected something wrong—thought him a deserter, and tried to arrest him ; that they told him they wanted him to open the door, and he did not ; that they tried to get in at the window, and he shot, wounding the man then lying there by the fire. They said the name of the wounded man was Knight ; that they had brought him that far in a buggy ; that he was suffering so much they could not take him further, and that they had sent for an ambulance. They stated, also, that a Surgeon had been to see him.

While Jones remained with them, which was fifteen minutes, or more, an ambulance arrived, and the wounded person was put into it and sent off to a hospital. After this, orders were given among the others to get up their knapsacks and start, some one saying that Col. Lee had ordered them to be out two days. Jones advised them to return to camp, and said he would make it right with Col. Lee. He told them they had fired into a man's house, and probably killed some of his family ; that the settlement was excited, and they would be fired upon if they went back ; that they had acted imprudently, and that he had been sent for to arrest them. To the remark that they had acted imprudently, they answered that they were acting under Colonel Lee's orders. They agreed, however, to return to camp, and went off in that direction.

Two or three days subsequently, Jones, then acting as a constable, upon a warrant charging them with this offence, arrested all the defendants in this indictment, or thirteen men answering to the same surnames, and explained to them for what the arrest was made. They gave him their names, and all admitted that they were present at the time and place of the alleged riot, and all but three said they fired. They said,

moreover; that they were obeying their superior officers, and could not be hurt for it; that they were doing only what they thought their duty; that the man fired on them and escaped from the house; that they did not know who he was, but thought he was a deserter, and that Knight was shot. Three of them said that they, themselves, did not shoot.

By actual recognition at the trial, Jones identified two of the defendants, Caldwell and another, as persons seen by him at the fire on Peachtree road; the rest on trial he could not recognize as having been there, but seven of them he did recognize as persons whom he took before the magistrate. He was not personally acquainted with any of them. When before the Magistrate he heard them say that Knight was dead.

Between the given names of the defendants, as set out in the indictment, and those furnished to Jones by the parties whom he arrested, were the following discrepancies:

*Indictment.*—William A., James M., James M., William P.
.*Furnished to Jones.*—W.    J. K.    Jeff.    W. T.

In their surnames there was no discrepancy.

This, in substance, was the case which the Jury had before them. It rested on the testimony of Collier and Jones, introduced by the State; and of Maj. Lee, Adjutant Wright, and Captain Hargraves, introduced by the defendants. Wright was Major Lee's acting Adjutant, and Hargraves was Captain of the Company to which the defendants belonged. The written order, also, which has been described above, was produced and read in evidence by the defendants.

T. W. J. HILL, for plaintiff in error.

N. J. HAMMOND, Solicitor General, for the State.

*By the Court.*—Jenkins, J. delivering the opinion.

Two only of the questions, presented by the Bill of Exceptions, were insisted on at the hearing before this Court.

[1.] The first point to be considered, is whether the defendants in the Court below were, or were not entitled, upon their mere motion, (without special cause assigned,) as a matter of right, to sever on their trial; or whether the severance was a matter in the discretion of the Court. There can be no doubt that by the Common Law the privilege rested upon the discretion of the Court. In the case of the *U. S. vs. Marchant & Colson*, 12th *Wheaton* 480, this subject was fully discussed, and the authorities reviewed by Mr. Justice Story: the conclusion of the Court, being that " where two or more persons are jointly charged in the same indictment, with a capital offence, they have not a *right*, by law, to be tried separately, without the consent of the prosecutor; but such separate trial is a matter to be allowed, in the *discretion* of the Court." To the same effect is the decision of the Supreme Court of the State of New York, in the case of *The People vs. Vermilyea*, 7th *Cowan's Reports*, 138, 140, 383. Authorities might be multiplied.

The question, then, is resolved into this, whether or not the Common Law rule on this subject has been changed by any statute of Georgia. The only section of the Code (now of force) which touches the question, is the 4574th, as follows : " Where two or more defendants shall be jointly indicted for any offence, any one defendant may be tried separately," &c. The remainder of the section applies only to cases wherein the offence charged requires the joint action of two or more persons, and simply enacts " that the acquittal or conviction of one shall not operate as the acquittal or conviction of any of the others."

According to all known practice and right reason, where a case is called for trial, in which two or more are jointly charged, and all parties announce themselves ready for trial, without special motion as to the order of proceeding, all of

3

the parties charged would be placed on trial. By the Common Law, however, and by the section of our Code above quoted, there may be a departure from this course. But how shall it be determined whether there shall or shall not be a departure? We have seen that at Common Law, that rested in the sound discretion of the Court.

Is there any indication in the phraseology of this section, that the Legislature intended to introduce a new rule? We can see none, unless the word *may* is to be construed as *shall*. If this be the right construction, the consequence would be, that under no circumstances can persons jointly charged be jointly tried, for there is no limitation or qualification superadded. The separate trial of any one would not depend upon his desire, or demand, nor yet upon any special circumstances in his case; nor, indeed, upon the willingness of the Court to gratify his desire, but upon an arbitrary rule of law. He is one of several jointly charged with crime, and if *may*, in this section, means *shall*, he must be tried separately, a concurrent desire for a joint trial by the Court, by the State's counsel, and by the defendants, to the contrary notwithstanding.

But it may be said, this is a strained construction; that the reasonable construction is, that any one desiring it—any one so electing—*shall* be tried separately. The reply is, that this goes to the extent of not only varying the ordinary signification of a word, but of interpolating other words. They who would construe "*may*" as "*shall*," and at the same time escape the dilemma of abolishing altogether joint trials, in joint indictments, assume that the Legislature (although they used no words of limitation) intended to restrict that provision to cases of joint indictment, wherein some one or more defendants demanded a severance. They interpret the Legislature as saying, the Court *shall* try any party jointly charged with others, separately, *in the discretion of that party*. Forced to admit discretion abiding in some breast, they claim it for the accused. Our view is, that if the law give a discretion, to do or not to do, a particular thing, in

the trial of a cause in court, without specifying by whom it is to be exercised, the Judge, who is the expounder of the law, and the controlling power, is, by general intendment, the depositary of that discretion.

But a reference to past legislation will throw light upon the subject:

The 50th section, 14th Div. of the Penal Code of 1833, (Cobb's Digest 841) is in these words : " When two or more defendants shall be jointly indicted for any offence, any one defendant *may* be tried separately, *except* such offences as require the action and concurrence of two or more to constitute the crime, and in such cases the defendants *shall* be tried *jointly.*"

By an act passed March 5th, 1856, amendatory of this section, it was enacted, " When two or more persons shall be jointly indicted for an offence, the commission of which requires the joint action or concurrence of two or more persons, any one of such persons, or more than one, may be put on trial without putting the other defendants on trial, at the same time; and the acquittal or conviction of any one, or more, of said defendants, shall not operate as an acquittal of any of the other defendants not put upon trial, but they shall be subject to be tried in the same manner as the other defendants."

Then comes the 4574th section of the Code, which super-cedes both the others, in these words : " When two or more defendants shall be jointly indicted for any offence, any one defendant may be tried separately; and if the offence be such as requires the joint action or concurrence of two or more persons, the acquittal or conviction of one shall not operate as an acquittal or conviction of any of the others not tried, but they shall be subject to be tried in the same manner."

Now, these several enactments are all in *pari materia,* and it is very evident that it was intended to incorporate into the new Code the other two enactments; or, in other

words, to retain the 50th section, 14th Div. of the Penal Code of 1833, as amended by the act of 1856.

The first clause of the section in the new Code is identical with that in the section of the Penal Code of 1833, and it is precisely there that the word "*may*" occurs. But in the latter clause of the 50th section, 14th Div. of the Code of· 1833, the word "shall" occurs—"the defendants *shall* be tried jointly." We think it abundantly clear that "*may*," in the first clause, is not used synonymously with "shall," in the last clause. "*May*" is permissive, reposing discretion somewhere; "*shall*" is peremptory, precluding all discretion. As already remarked, the Court must be recognized as the depositary of the discretion given. We do not say it is an unbridled, uncontrollable discretion; but where severance is demanded as a right, unsupported by cause shown, and refused, we are wholly indisposed to interfere with the exercise of the discretion.

[2.] But it is alleged that the Court erred in refusing a new trial, on the ground that the verdict is contrary to the evidence. What is the nature of the offence charged? "If any two or more persons, either with or without a common cause of quarrel, do an unlawful act of violence, or any other act in a violent and tumultuous manner, such persons so offending shall be guilty of a riot." Sec. 4400, Code of Georgia. The evidence is that the defendants were members of a military organization, assigned to the special duty of seeking for and arresting deserters from the army, and having their headquarters near Atlanta. Some of the neighbors of the prosecutor, residing a few miles from Atlanta, notified the commander of this force that there was in the neighborhood a band of lawless, desperate men, (believed to be deserters,) who were committing depredations upon the citizens. Thereupon, the commander issued written instructions to Lieut. Caldwell to detail twelve picked men, and proceed to the neighborhood designated, and arrest such men as were complained of, at the hazard of their lives. "The order enjoined upon him to be prompt and *prudent*, and after crossing

Peachtree Creek *to inquire at every house, where information might be obtained touching the whereabouts of the characters he was in quest of.*"

The defence in the Court below was placed partly on the ground that this order, under which they assembled and proceeded to act, saved them from the pains and penalties of a riot, notwithstanding any subsequent violent and unlawful conduct; but, upon better consideration, that line of defence has been abandoned in this Court. Thus authorized and instructed, let us see how they deported themselves. The house of the prosecutor was the first at which they called, arriving there after night, when the inmates were about retiring to rest. They first sought admittance on the plea of wanting water, which was furnished them by a servant, without being permitted to enter. They then peremptorily demanded admittance, which was refused, and they requested to go away. Did they state who they were, and under what authority, and for what purpose they came? Did they "inquire touching the whereabouts of the persons they were in search of?" Were they "*prudent?*" The evidence furnishes a negative answer to each of these questions. They sought to open a window by force, declaring they "*would come in, or knock out every damned door and window in the house.*" Accordingly, they called for an axe and actually broke a window, shivering the glass and sash. One of them then proceeded to enter the broken window, and was shot by the prosecutor in the act. They then fired several guns into the house, some of the balls entering the bedding, some passing over the heads of the children in their hiding place, and others flying all around the prosecutor, but, providentially, not inflicting even a wound upon the unoffending party thus lawlessly assailed. In short, the whole conduct and bearing of these men was precisely what might have been expected of the deserters, marauders, and burglars, whom they were sent to arrest, and doubtless caused them to be mistaken for that desperate and dreaded band of felons.

Did Collier incur the guilt and penalty of murder, or even

of manslaughter, by killing Knight, who was entering the window immediately upon breaking it? Why not? Because the person killed was violently and unlawfully entering his dwelling. This is a fair test. The evidence, indeed, screens them from the guilt and penalty of burglary, because it raises no presumption of intention to commit a felony after entrance; but it stamps their whole conduct with the character of aggravated riot. So far is the verdict from being contrary to the evidence, that evidence would have shamed a jury returning any other verdict.

The judgment below is affirmed.