# CASES,

## DECIDED IN THE

# SUPREME COURT OF GEORGIA

### AT THE

### MARCH TERM, 1899.

SMITH v. THE STATE.

1. The evidence did not warrant a charge on voluntary manslaughter.
2. The fact that one who has done an act which may amount to a crime immediately flees may always be given in evidence as tending to show guilt, but should always be considered by the jury in connection with the motive that prompted it, and at most is only one of a series of circumstances from which guilt may be inferred.
3. The provisions of law relating to justifiable homicide, where the parties had been engaged in mutual combat, contained in section 73 of the Penal Code, were not applicable to the facts of this case.
4. When two or more persons manifestly intend and endeavor in a riotous and tumultuous manner to enter the habitation of another for the purpose of assaulting or offering personal violence to any one being therein, and one of them, to prevent such entry, is killed by the occupant of the house, if the circumstances were sufficient to excite the fears of a reasonable man that such entry was intended, and the killing was done under the influence of such fears, such a homicide is justifiable, even though the assault or personal violence intended be less than a felony ; and a charge that the assault intended must amount to a felony was error.

Argued January 16, — Decided March 14, 1899.

Indictment for murder. Before Judge Hutchins. Gwinnett superior court. September term, 1898.

The accused was charged with the murder of James Coker, and was found guilty of voluntary manslaughter. According to the evidence for the State, Coker, together with Lewis McDaniel and John and Luther Wages, went to the house of the

accused at night, and proposed to buy a chicken and have it cooked there.   There was some discussion in the presence of the accused, between his wife and Coker, as to the price of the chicken.   She said she would not fix the chicken for anybody but McDaniel, and that Coker had thrown up her color to her. Coker went off a short distance from the house, but returned, and there was further talk about the chicken, in the course of which she told him that she would not fix it for him to save his life.   He again went off, and McDaniel, who also had left the house, proposed to return and see if she was going to fix the chicken.   She and the accused were together in the house. McDaniel went to the front of the house and told her that if she would fix the chicken she should have her money.   Coker came up through the yard and said, "She will fix it."   She said, "Coker is coming to the house," or "Coker is coming in here.   Yonder he comes."   The accused thereupon reached for his gun, and when Coker got within three or four steps of the house, shot him.   The shot struck him in the breast and killed him instantly.   When the party came to the house they were in a buggy with a mule attached to it, which they drove into the yard; and there was evidence that before the shooting took place the wife of the accused told Coker and McDaniel to take the mule out of the yard, and to go on off.   One of the witnesses testified that he heard her call Coker a "God damned liar."   John and Luther Wages were thirty-five or forty or fifty yards from the house when the shooting took place. There was evidence that the party brought a bottle of peach brandy with them, and had been drinking from it.

No witness was introduced by the accused, but he made a statement as follows:   Mr. Coker and those three men came up there to my house and said, "Hello, Sam," and I said "Hello" to them; and they told me to come out there, and says, "Here is a peddler out here"; and I said all right; and they said he had some goods that he was bound to sell.   Luther Wages says, "You know the old peddler."   I said that I would bring a light and look at them good, and I took a light, and then they said they didn't have any goods, that they had left them at Mr. Coker's.   They says, "Fix us up a chicken stew,"

.and asked what we would charge; and Ollie [the wife of the .accused] says she didn't know what, and says, "Sam, what is it worth?" I said I didn't know, and then Ollie said it was worth 30 cents, and got a light to catch the chicken, and one of the Wages boys says, "I'll help you," and- says, "Make haste, God damn you"; and Ollie says, "Try and respect me, and don't curse me," and told them to take the horse or mule off. They had hitched him to the house and he had torn off a plank, and she told them to take it away; but the first one that went to it said that it would stay right there, and that they would not take it anywhere. Ollie said that it was tear-ing down the house and tearing up the flowers. They quit cursing and we went in the house, but after we got in the house they kept cursing and going on. They said for Ollie to make haste and fix the chicken, and said they would give her 30 cents; and Ollie then says, "I don't care to cook it. I will just sell you the chicken"; and I told them, "Yes," that we could catch it and let them carry it to their own color. They were cursing around there as if they didn't respect us. These men then said they were not cursing, and for us to go on and fix the chicken. I told them that we would sell them the chicken and let them do what they pleased with it. They said "No, you have got to cook it." They said they couldn't get it cooked .anywhere else. Then they asked if we were not going to cook it, and we told them "No," and they said, "God damn it, get it and we will broil it on the fire coals"; and went on out ·doors, and they said, "Aint you going to cook it?" That was Mr. Coker and the biggest Wages boy talking, and they went on off after that and said they were going home; and then they said they would go to Mr. Stanford's to see if they could get any soup made. Ollie said they ought to have gone to their own color first. Nobody didn't go away but three of them. Mr. Lewis McDaniel stayed there, and in about a half an hour they came there, and that other Wages boy said, "Sam, why don't you have that chicken cooked?" and I told them that Ollie said they were cursing her, and Mr. Wages says, "She is a damn liar." That was the tallest Wages. Mr. Coker took it up and says, "By God, we will go out of

here when we get ready." About that time I told them to go
on out, and Ollie went and told them to go out of there, that
we didn't want to be bothered with them. Coker said, "By
God, I aint going till I get ready," and Mr. Wages asked him
what he was going to do, and he said, "I am going to kill some
of these damn niggers." Then Ollie told them to go, and I
did too; and they went out there and threw a rock at her, and
she dodged and ran in the house, and Coker took after her,
and I told him to stop, and he kept coming, and I kept telling
him to stop, and he kept coming on, and when he got within
three steps of the door I shot him. I went then down to Oscar
Williams's, my brother-in-law, to keep them from killing me.
I had had off my shoes and was fixing to go to bed when these
men come there. I was a half an hour going down to George
Summerour's and the clock was striking twelve when I was
passing there, and I got to Oscar Williams's before daybreak.
I came in yesterday and gave up to the sheriff myself. All
these men that came to my house that night were drinking.
Mr. Lewis McDaniel was so drunk he couldn't walk hardly.
He would fall down, and it looked like he didn't know much.

The grounds of the motion for a new trial, so far as material,
are stated in the opinion.

*John R. Cooper, Oscar Brown* and *J. A. Perry,* for plaintiff in
error. *C. H. Brand, solicitor-general,* contra.

LITTLE, J. The first two grounds of the motion for new
trial are based on the allegations that the verdict is contrary
to law, and without evidence to support it. Inasmuch as the
case goes back for another trial, we do not pass upon the weight
of the evidence in the case.

1. The next ground of error assigned is, that the court erred
in charging the jury the law in relation to voluntary man-
slaughter. We are of the opinion that, under the facts in this
case, there was no evidence which authorized a charge on the
law of voluntary manslaughter. We do not wish to be un-
derstood as saying that if the circumstances were different,
that is to say, if there was any proof or a legitimate inference
from the facts in evidence that the plaintiff in error slew the

·deceased as the result of passion founded on sufficient provo-cation found in the trespass of the deceased on the property of the accused, the offense of which he would be guilty would not be that of voluntary manslaughter. Every homicide committed as the result of passion is by no means to be classed as voluntary manslaughter. A homicide, when done in the absence of malice, and as the result of a sudden heat of passion engendered by a provocation sufficient in law to justify the passion, is graded below the crime of murder, because the killing is then partially excused on account of the justly aroused passion; nor is it always necessary, in order to grade the offense as voluntary manslaughter, that there should be an assault upon the person killing, to justify the excitement of passion which induced the homicide. *Golden* v. *State*, 25 *Ga.* 532; *Stokes* v. *State*, 18 *Ga.* 17. Our Penal Code, § 65, declares, that in all cases of voluntary manslaughter there must be some actual assault upon the person killing, or an attempt by the person killed to commit a serious personal injury on the person killing, or other equivalent circumstances to justify the excitement of passion. Assuming, as we must under the evidence, that the deceased was a trespasser on the property of the accused at the time of the homicide, under the theory of the State he was a mere trespasser without intending to injure the person or property. Under general criminal law, neither insulting nor abusive words or gestures, nor trespass, nor breach of contract, of themselves amount to sufficient provocation for an act of resentment likely to endanger life. A mere trespass on property, less than that to protect which our Code makes it justifiable homicide to kill the trespasser, may be resisted by any reasonable or necessary force short of taking or endangering life. Clark's Criminal Law, 145. If, in the course of a struggle to prevent such a trespass by the use of reasonable and necessary force which the owner is entitled to use, a struggle and combat ensue, then, whether the slayer is justified, guilty of murder or voluntary manslaughter, is to be determined by other rules, not necessary here to be discussed. According to the evidence, there was no attempt to remove the trespasser; but the theory of the State is, that the accused, with malice,

or actuated·by the spirit of revenge, deliberately shot the de-ceased while standing in the yard of the accused, when there was no necessity for him to do so to protect his habitation or family, and no circumstances at the time to justify a passion which caused him to shoot the deceased. The theory of the defendant was, that he shot and killed the deceased' to prevent him from entering his house, which he says the deceased was attempting to do, to commit an assault on the person of his wife. The issue is a clearly defined one. If the theory of the defendant be supported by the facts, he was not guilty of any offense, but was entirely justified. If the theory of the State be correct,· then the crime was murder. Under the evidence,. there seemed to have been a deliberate shooting on the part of the defendant, not as the result of passion, not in a struggle, nor was there any mutual combat, nor any evidence of an at-tempt by the slayer to remove the trespasser from his premi-ses otherwise than by deliberately shooting him down. The· evidence in this case is remarkable, not for what the witnesses who went to the house of the accused with the deceased say as to the facts of the homicide, but as to what they do not say; and although three of them were present at the time on the prem-ises of the accused, no clear account is rendered by any of them as to the facts of the homicide. But from the evidence of these witnesses, and circumstances shown by other witnesses, we fail to find any circumstances establishing the proposition that the shooting was the result of passion. This being true, a charge relating to· voluntary manslaughter was error. Nor can a con-viction for this offense stand, under the evidence disclosed in the record. *Dyal* v. *State*, 97 *Ga.* 428.

2. Another ground of the motion for a new trial alleges, that the court erred in charging on the subject of flight. The language of the court on this subject is as follows: "Something has been said upon the subject of flight. The rule on that subject is, that where one commits an act that amounts pre-sumptively to a crime, and the party who commits the act im-mediately flees from the processes and officers of the law, to' avoid arrest or trial, the presumption would be authorized that he fled, from the consciousness of guilt. That presumption

can be rebutted by showing that flight was not from a sense or consciousness of guilt, but for other reasons." It may be that the principle stated by the judge in his charge is a correct one; and if the propositions that the accused immediately flees from the processes and officers of the law, and that such flight is for the purpose of avoiding arrest or trial, be assumed, the conclusions which follow are legal and natural. But whether so or not, the charge as to the law of presumptions which apply to the flight of one who is charged with the commission of an offense, or has done an act which may amount to a crime, was too strongly put, and, without qualification, does not correctly lay down the principle applicable under the facts of this case. Mr. Wharton, in his work on Criminal Evidence, § 750, in treating this subject, says: "When a suspected person attempts to escape or evade a threatened prosecution, it may be argued that he does so from a consciousness of guilt, and though this inference is by no means strong enough by itself to warrant a conviction, yet it may become one of a series of circumstances from which guilt may be inferred." And further treating the subject, he also says: "The question, it can not be too often repeated, is simply one of inductive probable reasoning from certain established facts. All the courts can do, when such inferences are invoked, is to say that escape, disguise, and similar acts afford, in connection with other proof, the basis from which guilt may be inferred; but this should be qualified by a general statement of the countervailing considerations incidental to a comprehensive view of the question." Underhill, in his treatise on Criminal Evidence, § 119, citing 95 Mo. 623; 2 N. Y. Crim. Rep. 450, says: "It can not with correctness be said that the flight or attempted flight of the accused before his arrest, taken alone, raises any legal presumption of guilt, or that his flight, *without regard to the motive which prompted it*, is, in law, evidence of guilt. At the most it is only a circumstance to be considered by the jury with the reasons that prompted it, tending to show guilt, or by which an inference of guilt may be raised, and it has no probative force unless it appears that the accused fled to avoid arrest or imprisonment." In the case of Hickory *v.* United States, 160 U. S. 408, it was ruled, that the flight

of the accused is a presumption of 'fact, not of law, and is merely a circumstance tending to increase the probability of the defendant's being the guilty person, which is to be weighed by the jury like any other evidentiary circumstance.   See People *v.* Ah Ngow, 54 Cal. 151, s. c. 35 Am. Rep. 69.   And such also is the ruling of our own court.   *Jesse* v. *State,* 20 *Ga.* 156–166; *Smith* v. *State,* 63 *Ga.* 170; *Sewell* v. *State,* 76 *Ga.* 836. The judge in this case charged that the rule was, where one immediately flees to avoid arrest or trial, the presumption would be authorized that he fled, from the consciousness of guilt.   This, we think, was not a fair presentation of the law of this case; for there was evidence tending to show the flight was, not from the officers of the law, but to escape violence from the companions of the deceased, and the court made no qualification of its charge appropriate to the evidence just mentioned.   Flight is, at most, only a circumstance which may be weighed by the jury, in connection with other circumstances, to determine guilt, and is of itself no such circumstance as authorizes the jury to presume guilt.

3. Another ground of the motion for new trial is, that the court erred in charging the jury the provisions of section 73 of the Penal Code, in relation to the homicide of a person, where the killing must be done in order to save the life of the slayer.   It must be apparent that this law is wholly inapplicable to a case of this character.   The provisions of this section apply only to cases of mutual combat, where one person endeavors in good faith to decline any further struggle.   To such a person, it is only justifiable to slay his adversary after a bona fide effort to avoid all further difficulty.   *Powell* v. *The State,* 101 *Ga.* 9.   The slayer is protected in cases in which the provisions of this section apply, only when the killing was done as an absolute necessity to save his own life, and only in cases when it appears that the person killed was the assailant, or that the slayer had in good faith endeavored to decline any further struggle before he inflicted the mortal wound.   There was no evidence of any mutual combat between the deceased and the accused preceding this homicide.   On the contrary, the accused was in his house; the deceased on his premises

without the house. There was no evidence of quarreling be-
tween them, nor of any attempt to fight, and the rules which
determine the guilt or innocence of the defendant are not to
be found in these provisions of law.

4. An exception is taken to the charge of the court which
instructed the jury as follows: "If persons assemble before
another's house and actually advance on him, and render it
necessary for his protection, or make such demonstrations as
to excite the fears of a reasonable man that it was their inten-
tion to commit a felony on him or some member of his family,
he would be justified in shooting them; but if they merely
threaten to commit violence, he is not justifiable in shooting
until he has warned them off." We do not think this is a fair
presentation of the provisions of our law which afford protec-
tion to one who resists an invasion of the home in which he
dwells. Section 70 of the Penal Code declares, that it is justi-
fiable homicide for one to kill a person who, in connection
with another or others, manifestly intends and endeavors in
a riotous and tumultuous manner to enter the habitation of
another for the purpose of assaulting or offering personal
violence to any person dwelling or being therein. It was
held in the case of Hudgins v. State, 2 Ga. 173, that this pro-
vision of the Penal Code does not apply to a single individ-
ual, but contemplates the joint action of two or more per-
sons; and that under this section the killing is justifiable
when the assailants designed entering the habitation for the
purpose of assaulting or of offering any personal violence to
one of the inmates. So that this case establishes two prop-
ositions: that under this provision of the code it is justifi-
able homicide for one to kill another who, in company with
some person or with other persons, intends and endeavors in
a riotous and tumultuous manner to enter his habitation for
the purpose of assaulting or offering personal violence to any
person therein; and that it is not necessary, in order to justify,
that such personal violence shall amount to a felony.

In the case of Caldwell v. State, 34 Ga. 10, where a number
of persons went to the house of another and endeavored against
the will of the owner to force an entrance, and, having broken

a window, one of them proceeded to enter the window and was shot by the prosecutor in the act, this court held that a fair test of whether the prosecutor was guilty of murder or even of manslaughter was whether the person killed was violently and unlawfully entering his dwelling. Again, under the provisions of section 72 of the Penal Code, if, after persuasion, remonstrance, or other gentle measures used, a forcible attack and invasion on the habitation of another can not be prevented, it is justifiable homicide to kill the person so forcibly attacking and invading the habitation of another; but it must appear that such killing was absolutely necessary to prevent such attack and invasion, and that a serious injury was intended or might accrue to the person, property, or family of the person killing. Under the provisions of these two sections of our code, it must be apparent that the court erred in charging the jury as complained of. If, as a matter of fact, the evidence shows that more than one person, acting in concert and in the prosecution of a joint enterprise, went to the house of the plaintiff in error, then whether the provisions of section 70 of the Penal Code, above referred to, would apply, depends entirely upon whether they or one of them, in the prosecution of such common intent, manifestly intended and endeavored in a riotous and tumultuous manner to enter his house for the purpose of assaulting or offering personal violence to any person therein. Then, if the defendant shot and killed one of such persons so intending and endeavoring to enter, it would be justifiable homicide. If, however, only one of such persons made a forcible attack and attempt to invade the habitation, and after persuasion, remonstrance, or other gentle measures, such attack and invasion could not otherwise be prevented, it was justifiable homicide to kill the person so making the attack and invasion. And this is manifestly right. The law protects not only the person and property of the citizen, but it protects his home, whether it be a hut or a palace; and he who seeks in a violent manner to enter that habitation, and will not heed the remonstrance or persuasion of the owner, but continues the attack and invasion, intending to do a serious injury either to the person who resides there, to his house, or to some member

of the family, forfeits his life, and he who in good faith, under such circumstances, takes the life of the person so invading his home, is guiltless of crime, and is acting in the due protection of himself and his family. We do not say that the facts show that the plaintiff in error is thus protected; but these are the principles of law which, on his theory of the case, should have been given in charge to the jury; and the charge, as complained of, did not present, as we consider, the provisions of law which afford the slayer protection under the circumstances enumerated in the statute.

Other than as herein referred to, the court committed no error in its charge to the jury which calls for a reversal of its judgment. *Judgment reversed. All the Justices concurring.*