### 28300. SEAY *v.* THE STATE.

DECIDED OCTOBER 2, 1940.

*Weir S. Gaillard,* for plaintiff in error.
*G. Fred Kelley, solicitor-general, John E. Frankum, Ellis G. Arnall, attorney-general,* contra.

MACINTYRE, J. Roy Seay was convicted of larceny of an automobile. His motion for new trial was overruled, and he excepted. It appears from the evidence that the prosecutor loaned the defendant his automobile to go to Gainesville from Dahlonega. There are two paved routes from Dahlonega to Gainesville. The shortest route (about twenty-seven miles) leads southeast from Dahlonega into another highway, thence south to Gainesville, and might be called the "eastern route." The other route, which might be called the "western route," leads southwesterly from Dahlonega to Dawsonville, thence southeast to Gainesville, and the distance

is about thirty-nine miles. The prosecutor testified, that on the afternoon of May 13, 1937 (4 or 4:30 p. m.), he loaned the defendant a second-hand Ford automobile that he had purchased that morning for $150, in order that the defendant might go to Gainesville; that there was no discussion as to which route the defendant would use; that he loaned the defendant the car, but the defendant gave him some money for gasoline, and he was to return the car that same afternoon before closing time; and that he thought the defendant said something about taking his mother to Gainesville. On the next day, Sunday, the prosecutor found his car beside the highway on the "western route" during an independent search for it with the sheriff. The prosecutor first heard of the wreck Sunday afternoon, May 14.

The testimony of the defendant's witness and sister-in-law, Lilly Seay, was to the effect that she was the lady the defendant intended to carry to Gainesville on the day the car was wrecked, May 13. She stated that when he drove up in the car she refused to go, because the car "looked like an old trap, and the tires were worn out and everything," and it was unsafe; that while she lived at Baldwin, Georgia, yet she was visiting at Burtsboro at her mother-in-law's and the defendant's mother's house, and at that time she saw the defendant after the wreck, and his "shoulder was skinned up and his arm was skinned a little, and he was sore. . . He could hardly move the next morning." Burtsboro is between Dahlonega and Dawsonville on the paved highway, and to go from Burtsboro to Gainesville numbers of people would go west to Dawsonville, thence southeast to Gainesville, which would carry them over an all-paved highway. If they were at Burtsboro and wanted to go to Gainesville, they would not go back to Dahlonega and thence to Gainesville, but would go to Dawsonville and thence to Gainesville over the "western route." In other words, if they were at Burtsboro, they would ordinarily go to Gainesville over the Dawsonville-Gainesville (western) route.

Milton Ingram, a witness for the defendant, testified that he was at the scene of the wreck about two and one half or three miles from Dawsonville, between Dahlonega and Dawsonville on the Gainesville-Dawsonville route. This would have made the scene of the wreck about twelve miles from Dahlonega. The defendant was driving the car. A tire blew out, and the car pulled over side-

ways and ran into the car in which the witness was riding, went off the highway, hit a large tree standing beside the road, and was thus wrecked. The defendant was driving toward Dawsonville from the direction of Dahlonega. In his statement the defendant said that he rented the car from the prosecutor to go to Gainesville that night and paid him $3; that he went to Dawsonville to get Roy Stone, and came back to his mother's house with him, and was taking Roy Stone back to Dawsonville, where Stone lived, when the tire blew out and the car was wrecked; that he told Mr. Moore, the prosecutor, he would be back with the car about nine o'clock that night; and that the wreck happened about eight o'clock. "It [the wreck] knocked my shoulder all up, and I come up that night and stayed with Roy Stone, and I got Buck Stone to come up here and tell Mr. Moore the car had been wrecked, and he come up here and told him, I reckon. I don't know. I didn't steal the automobile." Arthur Stone testified: "The morning after the wreck of this car Roy Seay asked me to notify Mr. Moore the car was wrecked and he couldn't bring it in."

In rebuttal the State put the sheriff on the stand. He testified, that on Sunday after Mr. Moore had hired the car the afternoon before, he received a warrant to arrest the defendant, and he undertook to arrest the defendant, and as soon as the defendant saw him he fled; that he had not told the defendant what he wanted with him; and that on the next day (Monday), when he went to the defendant's house to arrest him, the defendant ran off back of the house.

"Flight is, at most, only a circumstance which may be weighed by the jury, in connection with other circumstances, to determine guilt, and is of itself no such circumstance as authorizes the jury to presume guilt." *Smith* v. *State*, 106 *Ga.* 673 (32 S. E. 851, 71 Am. St. R., 286). Except for the fact of flight, there are no other circumstances here to indicate that the defendant intended to steal the automobile, unless it be said that he did not return the car on time or did not himself notify the owner of the wreck. It does not seem to us that the fact that he was operating the car on the Dahlonega-Dawsonville-Gainesville highway, the "western route," rather than the "eastern route," which was the shorter of the two, should be a controlling circumstance in this case. The home of the defendant's mother at Burtsboro, where he was going to pick up some

one to carry to Gainesville, was on the "western route" between Dahlonega and Dawsonville, and the defendant's statement and the testimony of his witnesses seem to be uncontradicted, that he went to his mother's house, and his sister-in-law refused to go to Gainesville because of what she considered an unsafe condition of the car. (Although the State's witnesses testified that while the car was secondhand, yet it was entirely safe and in good condition.) After his sister-in-law refused to go with him he went to Dawsonville, picked up a friend, and brought him back to his mother's house (when going from Dawsonville to his mother's home in Burtsboro, he was, generally speaking, going toward Dahlonega, and was not attempting to escape with the automobile) ; and after that he was taking his friend back to his friend's home in Dawsonville when the tire blew out, threw his car against another car, and his car was wrecked. It seems, so far as the evidence shows, that the defendant had always been on the "western route" from Dahlonega to Gainesville; and if the evidence of flight is eliminated the other evidence certainly would not have warranted a verdict of guilty of larceny of an automobile. Nor do we think that his failure to return the car under the circumstances, it having been wrecked, plus the fact that he fled when he saw the sheriff approaching him, are sufficient to establish the guilt of the defendant, and that he had stolen or was in the act of stealing the car when the wreck occurred.

At one time in our judicial history flight resulted in the forfeiture of the goods of the accused, and raised a conclusive presumption of guilt. Flight is now held relevant merely as a circumstance tending to establish guilt, not in itself conclusive, nor can it create a legal presumption of guilt. 2 Wharton's Crim. Ev. 1831, § 950. "When a suspected person attempts to escape or evade a threatened prosecution, it may be argued that he does so from a consciousness of guilt; and though this inference is by no means strong enough by itself to warrant a conviction, yet it may become one of a series of circumstances from which guilt may be inferred." Id. 1494, § 750. "A person, however conscious of innocence, might not have the courage to stand a trial; but might, although innocent, think it necessary to consult his safety by flight." Id. 1496, § 750. Thus, in the instant case, the fact that the defendant had failed to go immediately back to Gainesville when the member of his family

refused to go with him, but then took a friend elsewhere than to Gainesville, but on the route which leads from Dahlonega to Dawsonville to Gainesville ("the western route"), and the fact that he wrecked the car while on the trip taking his friend, this in all likelihood was a reasonable hypothesis that while the defendant's acts were indicative of fear to tell the owner of the car that he had wrecked it, yet it is a reasonable hypothesis that his acts sprang from causes very different from that of consciousness of guilt of automobile stealing. During the entire time he had possession of the car before the wreck the defendant was operating it on the "western route" from Dahlonega to Gainesville, he having told the owner of the car in Dahlonega that he was going from there to Gainesville. Although he had been using the car from 4 or 4:30 in the afternoon until about 8 or 8:30 that night, at which time the wreck occurred, he was only about twelve miles from Dahlonega on the "western" Dahlonega-Gainesville route when the car was wrecked. Under the circumstances of this case we think the evidence, in order to authorize a finding of guilt of larceny, should show that there was an intention to deprive the owner of the automobile itself, not merely to take a casual trip or side trip. We do not think the evidence authorized a verdict of guilty of larceny of an automobile, and the judgment is reversed on the general grounds. We do not deem it necessary to discuss the other assignments of error; for some of them relate to matters that are not likely to occur on the next trial of the case, and none of the other assignments of error would alone require a reversal. *Dorsey* v. *State,* 126 *Ga.* 633, 635 (55 S. E. 479) ; *Georgia Power & Light Co.* v. *Wilson,* 48 *Ga. App.* 764 (3) (173 S. E. 220) ; *Daniel* v. *Dalton News Co.,* 48 *Ga. App.* 772, 776 (173 S. E. 727).

*Judgment reversed. Broyles, C. J., and Gardner, J., concur.*